# EXHIBIT 2

Case 2:21-cv-00861-TSZ    Document 82-2    Filed 05/06/22    Page 2 of 23

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

Washington, DC 20549

---

## FORM 8-K

---

### CURRENT REPORT
**Pursuant to Section 13 or 15(d)**
**of the Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported): October 18, 2021**

---

# Athira Pharma, Inc.

**(Exact name of registrant as specified in its charter)**

---

| **Delaware** | **001-39503** | **45-3368487** |
|:---:|:---:|:---:|
| (State or other jurisdiction | (Commission | (IRS Employer |
| of incorporation) | File Number) | Identification No.) |

**18706 North Creek Parkway, Suite 104**
**Bothell, WA 98011**
(Address of principal executive offices, including zip code)

**(425) 620-8501**
(Registrant's telephone number, including area code)

**N/A**
(Former name or former address, if changed since last report)

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|:---:|:---:|:---:|
| **Common Stock, $0.0001 par value per share** | **ATHA** | **The Nasdaq Stock Market LLC** |
| | | **(The Nasdaq Global Select Market)** |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging Growth Company ☒

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act). ☐

**Item 5.02 Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.**

**Item 8.01 Other Events.**

On October 21, 2021, Athira Pharma, Inc. ("Athira") announced via press release that an independent special committee of the board of directors has completed its internal investigation, which was originally announced in June, as well as certain changes in Athira leadership.

**Background**

Athira is currently advancing its lead development candidate, ATH-1017, a novel small molecule in clinical development for dementia associated with Alzheimer's Disease ("AD") and Parkinson's Disease. The mechanism of ATH-1017 is to enhance HGF/MET. HGF is a potent neurotrophic factor active in many cell types in the central nervous system. HGF activity through the MET receptor promotes survival and regeneration in a variety of neuron types. Significant scientific data support HGF/MET's role in maintaining neuronal health and function. ATH-1017 is a prodrug. Prodrugs are molecules that are converted to an active metabolite in the body. When ATH-1017 is administered, it metabolizes rapidly in plasma into hexanoic-tyrosine-isoleucine-(6)-amino-hexanoic amide, or dihexa.

From 2011 to 2015, Athira sought to develop dihexa, a drug candidate discovered at Washington State University ("WSU") and exclusively licensed to Athira. While the studies performed at Athira during this period demonstrated the pharmacologic activity of dihexa to enhance HGF/MET, they failed to demonstrate that it had the appropriate characteristics needed to be a successful therapeutic product. As a result, development of dihexa was discontinued and Athira instead commenced a campaign to discover another activator of HGF/MET with better drug-like properties. From 2015 to 2018, Athira designed and evaluated over 50 compounds that activated the HGF/MET pathway. ATH-1017 was selected for clinical development because of its improved drug-like properties, including solubility and pharmacokinetics, while retaining brain activity similar to that demonstrated by dihexa in animal models. Athira then filed a patent application claiming the composition of matter of ATH-1017 and methods of treatment using ATH-1017. The ATH-1017 composition of matter patent issued in the U.S. The ATH-1017 patent family is distinct from, and not part of the same patent family as, the dihexa patent licensed from WSU.

Since 2018, ATH-1017 has been assessed in multiple preclinical and clinical studies by Athira and by its third-party contractors. Studies performed by third parties sponsored by Athira regarding ATH-1017's safety profile and treatment potential include the following:

- A non-clinical study in an AD animal model (APP1/PS1), which showed that ATH-1017 treatment increased the qEEG gamma power that is associated with cognitive processing and memory.

- IND-enabling studies, including nonclinical GLP long-term toxicology and safety pharmacology studies performed by independent contract research organizations with validated methods and audited reports.

- A Phase 1a/b clinical trial in healthy young, healthy elderly, and AD subjects, in which ATH-1017 was shown to be well-tolerated with no serious adverse events and demonstrated statistically significant improvement in Event-Related Potential, or ERP. P300 latency, an objective measure of working memory processing speed, was noted in patients with AD following multiple dose treatments with ATH-1017 compared with those receiving placebo ($P<0.05$). An audit of the Phase 1a/b clinical trial was conducted by an independent auditing firm which affirmed GCP compliance and data management quality of that trial.

**Special Committee Findings**

The special committee, assisted by independent legal counsel, conducted a thorough investigation of allegations raised regarding doctoral research by Dr. Leen Kawas, Athira's chief executive officer and one of its founders, conducted while at WSU, as well as related matters.

The special committee's primary finding was that Dr. Kawas altered images in her 2011 doctoral dissertation and at least four research papers that she co-authored while a graduate student at WSU, and published from 2011 to 2014.

Among its other findings, the special committee found that Athira's issued U.S. patent claiming ATH-1017, Athira's lead development candidate, does not cite any paper which the committee found to contain an image altered by Dr. Kawas. Though the committee found that Athira has cited challenged research papers relating to dihexa to support the activity of ATH-1017, a prodrug of dihexa, in certain other communications and applications, it also found that Athira has conducted alternative preclinical studies to support ATH-1017's activity and recently submitted those studies for peer review publication.

Among its other findings, the special committee also found that WSU's dihexa patent incorporates images from papers co-authored by Dr. Kawas, certain of which were altered by Dr. Kawas. The committee understands that WSU is undertaking its own investigation into claims of potential misconduct involving research conducted by Dr. Kawas during her doctoral studies at WSU. The committee understands that this review is ongoing, and Athira cannot predict when WSU's investigation will be completed or what conclusions WSU will reach.

**Change of Leadership**

On October 18, 2021, Dr. Kawas submitted her resignation as president and chief executive officer of Athira and as a member of Athira's board of directors, effective October 18, 2021. Concurrently with Dr. Kawas's resignation, Athira's board of directors appointed Mark Litton, Ph.D., MBA as president and chief executive officer, and Ms. Rachel Lenington, MBA, as chief operating officer, each effective as of October 18, 2021. Dr. Litton was also appointed to the Athira board of directors.

Dr. Litton, 53, has served as Athira's chief operating officer since July 2019 and has carried out the day-to-day responsibilities of president and chief executive officer since June 2021. Prior to joining Athira, Dr. Litton served as the president and chief operating officer of Alpine Immune Sciences, Inc., a publicly traded biotechnology company, from August 2018 to April 2019. Dr. Litton served as the chief business officer, treasurer, and secretary from 2004 to 2018 of Alder BioPharmaceuticals, Inc., a publicly traded biopharmaceutical company co-founded by Dr. Litton in 2004, which was acquired by Lundbeck A/S in October 2019. From 1999 to 2004, Dr. Litton served as vice president of business development for Celltech Group, where he was responsible for securing, commercializing, and partnering on numerous novel discoveries and therapeutic programs. In 1999, Dr. Litton joined Celltech Group as an employee of Chiroscience Group plc and was later promoted to vice president of business development after Chiroscience's merger with Celltech Group in 1999. From 1997 to 1999, Dr. Litton served as the manager of business development for Ribozyme Pharmaceuticals Inc. (now Sirna Therapeutics, Inc.), a biopharmaceutical company and wholly owned subsidiary of Alnylam Pharmaceuticals, Inc., where he helped form relationships with Eli Lilly and Company, Roche Bioscience and GlaxoWellcome plc (now GlaxoSmithKline plc). From 1991 to 1994, Dr. Litton served as a research associate for DNAX Research Institute, a research facility of Schering-Plough (now Merck & Co., a publicly traded pharmaceutical company). Dr. Litton earned a Ph.D. in immunology from Stockholm University in 1997, an M.B.A. from Santa Clara University in 1994, and a B.S. in biochemistry from the University of California Santa Cruz in 1990.

Ms. Lenington, 48, has served as Athira's chief technology officer, head of product development strategy, since June 2021. From 2015 to 2020, Ms. Lenington served as senior vice president of program and portfolio management at Seagen Inc., a publicly traded biotechnology company, where she led a team responsible for strategic business operations, program, portfolio, and alliance management, and played an instrumental role in scaling the organization as it transformed into a global, multi-product oncology company. From 2010 to 2015, Ms. Lenington was deputy director, strategy, planning and management at the Bill & Melinda Gates Foundation, where she managed strategy, business operations, and grant budgets for select global health programs. From 2000 to 2010, Ms. Lenington held roles of increasing responsibility at Amgen and at Immunex prior to its 2002 acquisition by Amgen, including director, global program manager. From 1995 to 1996 and from 1996 to 2000, Ms. Lenington was a management consultant first for Accenture and then at Deloitte Consulting, respectively, focused on change management and ERP software implementation at Fortune 100 companies. Ms. Lenington earned an M.B.A. from Pepperdine University in 2005 and a bachelor of business administration degree from the University of Washington in 1995.

There are no arrangements or understandings between either Dr. Litton or Ms. Lenington and any other person pursuant to which they were appointed to the positions noted above. There are no family relationships between either Dr. Litton or Ms. Lenington and any director, executive officer, or person nominated or chosen by Athira to become a director or executive officer of Athira. Athira has not entered into any transactions with either Dr. Litton or Ms. Lenington that would require disclosure pursuant to Item 404(a) of Regulation S-K under the Securities Exchange Act of 1934.

**Executive Compensation Matters**

*Dr. Litton*

In connection with Dr. Litton's appointment as president and chief executive officer, the compensation committee of the board of directors approved an increase to his 2021 annual base salary to $510,000, retroactively effective as of October 1, 2021. In addition, the compensation committee intends to grant Dr. Litton a restricted stock unit ("RSU") award for 60,000 shares of Athira's common stock, subject to the terms and conditions of Athira's 2020 Equity Incentive Plan (the "2020 Plan"). The RSU award is intended to vest in three equal tranches. The first two tranches are expected to vest upon the satisfaction of certain clinical development milestones, with the third tranche expected to vest on the six-month anniversary of the satisfaction of the second achieved clinical development milestone (collectively, the "RSU Vesting Terms").

The compensatory and other material terms of Dr. Litton's confirmatory employment letter (the "Litton Employment Letter") with Athira, dated September 8, 2020, and the terms in Dr. Litton's change in control and severance agreement (the "Litton Change in Control Agreement") with Athira, dated September 8, 2020, will remain unchanged except as revised pursuant to the compensation committee's actions described in the immediately preceding paragraph. A summary of the Litton Change of Control Agreement is set forth below. The Litton Employment Letter has no specific term and provides that Dr. Litton is an at-will employee and supersedes all prior employment agreements between Dr. Litton and Athira. The Litton Employment Letter also provides for an annual target cash incentive payment equal to 40% of his annual base salary. The foregoing description of the Litton Employment Letter is not complete and is qualified in its entirety by reference to the full text thereof, a copy of which is filed as Exhibit 10.15 to Athira's Registration Statement on Form S-1/A filed with the Securities and Exchange Commission on September 9, 2020.

*Ms. Lenington*

In connection with Ms. Lenington's appointment as chief operating officer, the compensation committee of the board of directors approved an increase to her 2021 annual base salary to $430,000, retroactively effective as of October 1, 2021. In addition, pursuant to the terms of Ms. Lenington's offer letter with Athira, dated April 27, 2021 (the "Lenington Offer Letter"), the compensation committee intends to grant Ms. Lenington an option to purchase 150,000 shares of Athira's common stock at an exercise price equal to the fair market value on the date of grant, subject to the terms and conditions of the 2020 Plan. The shares subject to the option will be scheduled to vest as to one-fourth of the shares on each of the first, second, third, and fourth anniversaries of June 14, 2021, the date Ms. Lenington's employment with Athira commenced. The compensation committee also intends to grant Ms. Lenington an RSU award for 30,000 shares of Athira's common stock, subject to the terms and conditions of the 2020 Plan. The RSU award is intended to vest in three equal tranches in accordance with the RSU Vesting Terms described above.

The compensatory and other material terms of the Lenington Offer Letter and the terms in Ms. Lenington's change in control and severance agreement (the "Lenington Change in Control Agreement") with Athira, effective June 14, 2021, will remain unchanged except as revised pursuant to the compensation committee's actions described in the immediately preceding paragraph. A summary of the Lenington Change of Control Agreement is set forth below. The Lenington Offer Letter has no specific term and provides that Ms. Lenington is an at-will employee. The Lenington Offer Letter also provides for an annual target cash incentive payment equal to 40% of her annual base salary. The foregoing description of the Lenington Offer Letter is not complete and is qualified in its entirety by reference to the full text thereof, a copy of which is filed as Exhibit 10.1 to Athira's Quarterly Report on Form 10-Q filed with the Securities and Exchange Commission on August 16, 2021.

Pursuant to the terms of the Litton Change in Control Agreement and the Lenington Change in Control Agreement, if the employment of either executive officer is terminated outside the period beginning one month prior to the date of a change in control and ending 12 months following that change in control (the Change in Control Period) either (1) by Athira without "cause" (excluding by reason of death or disability) or (2) by the executive officer for "good reason" (as such terms are defined in the executive officer's change in control and severance agreement), the executive officer will receive the following benefits if such executive officer timely signs and does not revoke a release of claims in Athira's favor:

  • a lump-sum payment equal to 9 months of the executive officer's annual base salary as in effect immediately prior to such termination (or if such termination is due to a resignation for good reason based on a material reduction in base salary, then as in effect immediately prior to the reduction); and

  • payment of premiums for coverage under the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended (COBRA), for the executive officer and his or her eligible dependents, if any, for up to 9 months.

If, during the Change in Control Period, the employment of either executive officer is terminated either (1) by Athira without cause (excluding by reason of death or disability) or (2) by the executive officer for good reason, the executive officer will receive the following benefits if the executive officer timely signs and does not revoke a separation agreement and release of claims in Athira's favor:

  • a lump-sum payment equal to 12 months of the executive officer's annual base salary as in effect immediately prior to such termination (or if such termination is due to a resignation for good reason based on a material reduction in base salary, then as in effect immediately prior to the reduction) or if greater, at the level in effect immediately prior to the change in control;

  • a lump-sum payment equal to 100% of the executive officer's target annual bonus as in effect for the fiscal year in which such termination occurs or if greater, at the level in effect, immediately prior to the change in control;

  • payment of premiums for coverage under COBRA for the executive officer and the executive officer's eligible dependents, if any, for up to 12 months; and

  • 100% accelerated vesting and exercisability of all Athira equity awards with service-based vesting (but that are not subject to performance-based vesting) that are outstanding and unvested as of the date of the qualifying termination.

In addition, the Litton Change in Control Agreement provides for 100% accelerated vesting and exercisability of Athira equity awards granted under its 2014 Equity Incentive Plan and held by Dr. Litton to the extent such awards are not assumed or substituted for by the successor corporation in a change in control.

If any of the amounts provided for under the Litton Change in Control Agreement or the Lenington Change in Control Agreement, as applicable, would constitute "parachute payments" within the meaning of Section 280G of the Internal Revenue Code and could be subject to the related excise tax, the executive officer would be entitled to receive either full payment of benefits or such lesser amount which would result in no portion of the benefits being subject to the excise tax, whichever results in the greater amount of after-tax benefits to the executive officer. Neither agreement requires Athira to provide any tax gross-up payments.

Pursuant to the terms of the Litton Change in Control Agreement and the Lenington Change in Control Agreement, "cause" generally means the executive officer's: indictment or conviction of any felony or any crime involving dishonesty or moral turpitude; participation in any fraud against Athira or other dishonesty which is not the result of an innocent or inadvertent mistake by the executive officer with respect to Athira; willful violation of the executive officer's obligations to Athira after there has been delivered to the executive officer a written demand for performance from the board of directors; continued violation or breach of any material written company policy, agreement with Athira, or any statutory or fiduciary duty to Athira after Athira has delivered to the executive officer a written notification of such violation or breach; or damaging or misappropriating or attempting to damage or misappropriate any of Athira's property, including intellectual property.

Pursuant to the terms of the Litton Change in Control Agreement and the Lenington Change in Control Agreement, "good reason" generally means that the executive officer resigns from Athira within 30 days following the end of Athira's cure period as a result of any of the following that occurs without his or her consent: a material reduction in the executive officer's duties or responsibilities that is inconsistent with his or her position, provided that a mere change of title alone will not constitute such a material reduction; the requirement that the executive officer change his or her principal office to a facility that increases his or her commute by more than 40 miles from his or her commute to the location at which the executive officer was employed prior to such change; or a material reduction in base salary or a material reduction in his or her employee benefits (other than (1) in connection with a general decrease in salary (or employee benefits, as applicable) of all similarly situated employees, and (2) following Athira's change in control, to the extent necessary to make his or her salary (or employee benefits, as applicable) commensurate with those of Athira's other employees or Athira's successor entity or parent entity who are similarly situated with him or her). For a resignation to qualify as "good reason," the executive officer also must provide written notice within 90 days following the initial existence of the good reason condition, and Athira must have failed to materially remedy such event within 30 days after receipt of such notice.

The foregoing description of the Litton Change in Control Agreement and the Lenington Change in Control Agreement are not complete and are qualified in their entirety by reference to the full text thereof, copies of which are filed as Exhibit 10.19 to Athira's Registration Statement on Form S-1/A filed with the Securities and Exchange Commission on September 9, 2020 and Exhibit 10.2 to Athira's Quarterly Report on Form 10-Q filed with the Securities and Exchange Commission on August 16, 2021.

*Other Named Executive Officers*

In addition to the compensation matters described above, on October 18, 2021, the compensation committee of the board of directors approved an increase to the 2021 annual base salaries of Dr. Hans Moebius, Athira's Chief Medical Officer, and Ms. Glenna Mileson, Athira's Chief Financial Officer, to $430,000 and $405,000, respectively, retroactively effective as of October 1, 2021.

**Dr. Kawas' Separation Agreement**

In connection with the cessation of Dr. Kawas's employment and pursuant to the terms of her separation agreement dated October 18, 2021 (the "Separation Agreement"), Dr. Kawas is eligible to receive (i) a lump sum equivalent to one year of her base salary, for a total of $510,000, less applicable withholdings; and (ii) reimbursement of continued health coverage for herself and her dependents under COBRA for a period of up to 18 months, unless her and her dependents become covered under similar plans or are no longer eligible for continuation coverage under COBRA. In addition, under the Separation Agreement, Dr. Kawas will retain previously granted options, vested as of the effective date of the Separation Agreement, for 363,535 shares of Athira's common stock. Dr. Kawas's receipt of the foregoing severance benefits is subject to her continued compliance with the terms of her employment agreement dated September 8, 2020, confidential information, invention assignment, and arbitration agreement and Separation Agreement, which agreement includes a release of claims and certain customary confidentiality, non-solicitation, non-competition and non-disparagement provisions. The foregoing description of the Separation Agreement is only a summary of its material terms, does not purport to be complete, and is qualified in its entirety by reference to the Separation Agreement that is filed as Exhibit 10.1 to this current report on Form 8-K.

On October 21, 2021, Athira issued a press release announcing the matters described above, a copy of which is filed as Exhibit 99.1 to this Current Report on Form 8-K and is incorporated herein by reference.

**Item 9.01 Financial Statements and Exhibits.**

**(d) Exhibits.**

| Exhibit No. | Description |
| --- | --- |
| 10.1 | Separation Agreement dated October 18, 2021 between Leen Kawas and Athira |
| 99.1 | Athira Pharma, Inc. press release dated October 21, 2021 |
| 104 | Cover Page Interactive Data File (formatted as Inline XBRL) |

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**Athira Pharma, Inc.**

Date: October 21, 2021                                    By:    /s/ Glenna Mileson

                                                                   Glenna Mileson
                                                                   Chief Financial Officer

3

**SEPARATION AGREEMENT AND RELEASE**

This Separation Agreement and Release ("Agreement") is made by and between Leen Kawas ("Employee") and Athira Pharma, Inc. (the "Company") (collectively referred to as the "Parties" or individually referred to as a "Party").

WHEREAS, Employee was employed at-will by the Company pursuant to that certain Confirmatory Employment Letter between the Parties dated September 8, 2020 (the "Employment Letter");

WHEREAS, Employee signed an At-Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement with the Company on September 8, 2020 (the "Confidentiality Agreement");

WHEREAS, the Parties entered into a Change in Control and Severance Agreement dated September 8, 2020 (the "Severance Agreement");

WHEREAS, Employee was granted the stock options to purchase shares of the Company's common stock (each, an "Option" and together, the "Options") indicated on Exhibit A, subject to the terms and conditions of the applicable stock option grant notice and option agreement (with respect to Options granted under the Company's 2014 Equity Incentive Plan (as amended from time to time, the "2014 Plan")) or stock option agreement (with respect to Options granted under the Company's 2020 Equity Incentive Plan (the "2020 Plan" and, together with the 2014 Plan, the "Plans" and each, a "Plan")), as each such agreement may have been amended from time to time (each, an "Option Agreement"), and further subject to the applicable Plan under which it was granted (as indicated on Exhibit A) (collectively the foregoing Option Agreements and Plans are referred to herein as the "Stock Agreements");

WHEREAS, the Parties entered into that certain Indemnification Agreement dated September 10, 2020 (the "Indemnification Agreement");

WHEREAS, Employee will separate from employment on the Effective Date of this Agreement (the "Separation Date") and such separation is the result of a termination without Cause (as defined in the Severance Agreement); and

WHEREAS, the Parties wish to resolve any and all disputes, claims, complaints, grievances, charges, actions, petitions, and demands that the Employee may have against the Company and any of the Releasees (as defined below), including, but not limited to, any and all claims arising out of or in any way related to Employee's employment with or separation from the Company;

NOW, THEREFORE, in consideration of the mutual promises made herein, the Company and Employee hereby agree as follows:

**COVENANTS**

1. Consideration. In consideration of Employee's execution of this Agreement and Employee's fulfillment of all of its terms and conditions, the Company agrees as follows:

a. Separation Payment. The Company agrees to pay Employee a lump sum equivalent to one (1) year of Employee's base salary, for a total of Five Hundred Ten Thousand Dollars ($510,000), less applicable withholdings. This payment will be made to Employee on the first regularly scheduled payroll date of the Company following the Effective Date of this Agreement.

b. COBRA Reimbursement. Provided Employee timely elects and pays for continuation coverage pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("COBRA"), within the time period prescribed pursuant to COBRA, and subject to the terms of this paragraph, Employee will receive Company-paid for group health, dental, and vision COBRA coverage for Employee and Employee's eligible dependents (if applicable) (the "COBRA Severance") following the Separation Date until the earliest of (i) eighteen (18) months following the Separation Date, (ii) the date on which Employee and Employee's eligible dependents (as applicable) become covered under similar plans, and (iii) the expiration of Employee's (and any of Employee's eligible dependents', as applicable) eligibility for continuation coverage under COBRA. If the Company determines in its sole discretion that it cannot provide the COBRA Severance without potentially violating, or being subject to an excise tax under, applicable law (including, without limitation, Section 2716 of the Public Health Service Act), then Section 5.3 ("COBRA Severance Limitations") of the Severance Agreement will apply.

c. General. Employee acknowledges that without this Agreement, Employee is otherwise not entitled to the consideration listed in this Section 1. Employee further acknowledges and agrees that the consideration set forth in this Section 1 constitutes and exceeds the consideration to which Employee is entitled under the Severance Agreement, and that Employee is entitled to no further severance compensation or severance benefits under the Severance Agreement or otherwise.

2. Stock Options.

a. General. The Parties agree that for purposes of determining the number of shares of the Company's common stock that Employee is entitled to purchase from the Company, pursuant to the exercise of outstanding options, Employee will be considered to have vested only up to the Separation Date and, except as provided by the following sentence, will have no further rights to vest in any Option. The Parties acknowledge that pursuant to the terms of the Option granted to Employee on December 18, 2018, the shares that remain unvested under the Option as of the Separation Date will remain outstanding for ninety (90) days following the Separation Date, such that if a definitive agreement providing for the consummation of a Change in Control (as defined in the 2014 Plan) is executed within such ninety (90)-day period, the remaining unvested shares subject to such Option will vest. If a definitive agreement providing for the consummation of a Change in Control is not executed within such ninety (90)-day period, the remaining unvested shares subject to the Option will immediately terminate. Employee acknowledges that as of the Separation Date, Employee will have vested in the number of shares subject to each Option as indicated in Exhibit A hereto and no more.

b. Exercisability. The exercise of Employee's vested options and shares shall continue to be governed by the terms and conditions of the Company's Stock Agreements. The Parties acknowledge that the portions of each Option that is vested and exercisable as of the Separation Date will be exercisable during the post-service exercise period applicable to such Option under its existing terms and further acknowledge, for the avoidance of doubt, and subject to the following sentence of this paragraph, that (i) pursuant to the currently existing terms of the Options granted to Employee on August 29, 2014, Employee may exercise such portion of the Option that is vested and exercisable as of the Separation Date until August 28, 2024, (ii) pursuant to the currently existing terms of the Options granted to Employee on January 22, 2018, Employee may exercise such portion of the Option that is vested and exercisable as of the Separation Date until January 21, 2023, (iii) pursuant to the currently existing terms of the Options granted to Employee on October 24, 2015 and December 18, 2018, Employee may exercise such portion of the Option that is vested and exercisable as of the Separation Date (and, with respect to the December 18, 2018 Option, any portion of such Option that vests due to the execution of a definitive agreement as described in Section 2.a above) until the earliest of (A) the date that is three (3) months following the Separation Date, provided that if during any part of such three (3) month period the Option is not exercisable solely because of the condition set forth in the section of the applicable Option Agreement relating to "Securities Law Compliance," such Option shall not expire until the earlier of the Option's expiration date or until it shall have been exercisable for an aggregate period of three (3) months after the Separation Date, and (B) eighteen (18) months after Employee's death if Employee dies within three (3) months following the Separation Date, and (iv) pursuant to the currently existing terms of the Options granted to Employee on September 17, 2020 and February 18, 2021, Employee may exercise such portion of the Option

2

that is vested and exercisable as of the Separation Date for three (3) months following the Separation Date, provided that if Employee dies within three (3) months following the Separation Date, such Options shall be exercisable, to the extent vested, for eighteen (18) months following the Separation Date. Notwithstanding the foregoing, in no event may any Option be exercised following the expiration date of the such Option, and each Option shall be subject to early termination in accordance with the change in control, merger, dissolution or liquidation provisions, or other similar provisions of the Plan under which the applicable Option was granted. Employee agrees and acknowledges that if any of the Options (or portion thereof) had been designated in its underlying Option Agreement as, and was intended to and actually does qualify as, an "incentive stock option" (an "ISO") under Section 422 of the Internal Revenue Code of 1986, as amended (the "Code"), then to the extent any portion of such Option is exercised more than three (3) months following the Separation Date, such portion shall be treated for tax purposes as a nonqualified stock option and upon exercise will be subject to all applicable tax withholdings. Employee acknowledges and agrees that Employee remains solely responsible for all employee-related tax withholdings associated with the exercise of any of the Options.

3. <u>Resignation</u>. By executing this Agreement, Employee hereby resigns from all positions and offices currently held as an officer or director of the Company, effective as of the Separation Date. Employee also agrees to execute any necessary documents or other forms necessary to effectuate or document the foregoing resignation as a matter of local, state, federal, or international law. Employee further understands and agrees that, effective as of the Separation Date, she will no longer serve in any positions with the Company.

4. <u>Benefits</u>. Employee's health insurance benefits shall cease no later than the last day of the month in which the Separation Date occurs (or such earlier date as may be required by applicable plan terms and conditions), subject to Employee's right to continue Employee's health insurance under COBRA. Employee's participation in all benefits and incidents of employment, including, but not limited to, vesting in stock options, and the accrual of bonuses, vacation, and paid time off, ceased as of the Separation Date.

5. <u>Payment of Salary and Receipt of All Benefits</u>. Employee acknowledges and represents that, other than the consideration set forth in this Agreement, the Company and its agents have paid or provided all salary, wages, bonuses, accrued vacation/paid time off, notice periods, premiums, leaves, housing allowances, relocation costs, interest, severance, outplacement costs, fees, reimbursable expenses, commissions, stock, stock options, vesting, and any and all other benefits and compensation due to Employee.

6. <u>Release of Claims</u>. Employee agrees that the foregoing consideration represents settlement in full of all outstanding obligations owed to Employee by the Company and its current and former officers, directors, employees, agents, investors, attorneys, shareholders, administrators, affiliates, benefit plans, plan administrators, insurers, trustees, divisions, and subsidiaries, and predecessor and successor corporations and assigns (collectively, the "Releasees"). Employee, on Employee's own behalf and on behalf of Employee's respective heirs, family members, executors, agents, and assigns, hereby and forever releases the Releasees from, and agrees not to sue concerning, or in any manner to institute, prosecute, or pursue, any claim, complaint, charge, duty, obligation, or cause of action relating to any matters of any kind, whether presently known or unknown, suspected or unsuspected, that Employee may possess against any of the Releasees arising from any omissions, acts, facts, or damages that have occurred up until and including the date Employee signs this Agreement, including, without limitation:

a. any and all claims relating to or arising from Employee's employment relationship with the Company, the termination of that relationship, and the decision to terminate that relationship, including any claims arising out of or under the Employment Letter or any other agreement related to Employee's employment with the Company or otherwise;

b. any and all claims relating to, or arising from, Employee's right to purchase, or actual purchase of shares of stock of the Company, including, without limitation, any claims for fraud, misrepresentation, breach of fiduciary duty, breach of duty under applicable state corporate law, and securities fraud under any state or federal law;

3

c. any and all claims under the law of any jurisdiction, including, but not limited to, wrongful discharge of employment; constructive discharge from employment; termination in violation of public policy; discrimination; harassment; retaliation; breach of contract, both express and implied; breach of covenant of good faith and fair dealing, both express and implied; promissory estoppel; negligent or intentional infliction of emotional distress; fraud; negligent or intentional misrepresentation; negligent or intentional interference with contract or prospective economic advantage; unfair business practices; defamation; libel; slander; negligence; personal injury; assault; battery; invasion of privacy; false imprisonment; conversion; and disability benefits;

d. any and all claims for violation of any federal, state, or municipal statute, including, but not limited to, the following, each as may be amended, and except as prohibited by law: Title VII of the Civil Rights Act of 1964; the Civil Rights Act of 1991; the Rehabilitation Act of 1973; the Americans with Disabilities Act of 1990; the Equal Pay Act; the Fair Labor Standards Act; the Fair Credit Reporting Act; the Employee Retirement Income Security Act of 1974; the Worker Adjustment and Retraining Notification Act; the Family and Medical Leave Act; the Uniformed Services Employment and Reemployment Rights Act; the Immigration Reform and Control Act; the National Labor Relations Act; the Washington Law Against Discrimination (RCW ch. 49.60); other Washington sex and age discrimination laws (e.g., RCW 49.12.200, 49.44.090); Washington laws regarding prohibited employment practices (RCW ch. 49.44); the Washington Equal Pay Opportunity Act (RCW ch. 49.58); Washington whistleblower protection laws (e.g., RCW 49.60.210, 49.12.005, and 49.12.130); the Washington Family Care Act (RCW 49.12.265 to 49.12.295); the Washington Family Leave Act (RCW ch. 49.78); the Washington Military Family Leave Act (RCW ch. 49.77); the Washington Paid Family and Medical Leave Act (RCW ch. 50A.04); the Washington Minimum Wage Act (RCW ch. 49.46); the Washington law regarding non-competition agreements (RCW ch. 49.62); Washington wage, hour, and working conditions laws, and all other provisions of the Washington Industrial Welfare Act (RCW ch. 49.12); the Washington Wage Payment Act (RCW ch. 49.48); and the Washington Wage Rebate Act (RCW ch. 49.52);

e. any and all claims for violation of the federal or any state constitution;

f. any and all claims arising out of any other laws and regulations relating to employment or employment discrimination;

g. any claim for any loss, cost, damage, or expense arising out of any dispute over the nonwithholding or other tax treatment of any of the proceeds received by Employee as a result of this Agreement; and

h. any and all claims for attorneys' fees and costs.

Employee agrees that the release set forth in this section shall be and remain in effect in all respects as a complete general release as to the matters released. This release does not extend to any obligations incurred under this Agreement. This release does not release claims that cannot be released as a matter of law, including any Protected Activity (as defined below). Any and all disputed wage claims that are released herein shall be subject to binding arbitration in accordance with Section 18, except as required by applicable law. This release does not extend to any right Employee may have to unemployment compensation benefits or workers' compensation benefits. In addition, this release does not extend to any rights of indemnification or advancement Employee may have pursuant to the Indemnification Agreement, the Company's certificate of incorporation and bylaws, or any rights or coverage under any applicable D&O insurance policy, subject to the respective terms, conditions, and limitations the Indemnification Agreement, certificate of incorporation and bylaws, or D&O insurance policy, in each case, as may be applicable.

4

7. Unknown Claims. Employee acknowledges that Employee has been advised to consult with legal counsel and that Employee is familiar with the principle that a general release does not extend to claims that the releaser does not know or suspect to exist in Employee's favor at the time of executing the release, which, if known by Employee, must have materially affected Employee's settlement with the Releasees. Employee, being aware of said principle, agrees to expressly waive any rights Employee may have to that effect, as well as under any other statute or common law principles of similar effect.

8. No Pending or Future Lawsuits. Employee represents that Employee has no lawsuits, claims, or actions pending in Employee's name, or on behalf of any other person or entity, against the Company or any of the other Releasees. Employee also represents that Employee does not intend to bring any claims on Employee's own behalf or on behalf of any other person or entity against the Company or any of the other Releasees.

9. Application for Employment. Employee understands and agrees that, as a condition of this Agreement, Employee shall not be entitled to any employment with the Company, and Employee hereby waives any right, or alleged right, of employment or re-employment with the Company. Employee further agrees not to apply for employment with the Company and not otherwise pursue an independent contractor relationship with the Company.

10. Trade Secrets and Confidential Information/Company Property. Employee reaffirms and agrees to observe and abide by the terms of the Confidentiality Agreement, specifically including the provisions therein regarding nondisclosure of the Company's trade secrets and confidential and proprietary information, and all restrictive covenants. Employee acknowledges that the non-disclosure obligations in the Confidentiality Agreement do not restrict Employee from disclosing work-related sexual harassment or sexual assault to the extent such disclosures are protected under RCW 49.44.210. Employee's signature below constitutes Employee's certification under penalty of perjury that, after a diligent search, Employee has returned all documents and other Company property provided to Employee by the Company (whether in physical or electronic form), developed or obtained by Employee in connection with Employee's employment with the Company, or otherwise belonging to the Company, including, but not limited to, any and all confidential, proprietary and trade secret information, as well as all passwords to any software or other programs or data that Employee used in performing services for the Company. The Company has obtained an image of the hard drive of Employee's Company-issued laptop (the "Laptop") and agrees that Employee may retain the Laptop; provided that on or before the Separation Date, Executive must have provided the Laptop to the Company for the review and/or removal of any Company property (including, but not limited to, any Company or associated third party confidential information, trade secrets, or licensed software) from the Laptop as the Company deems appropriate. During the ten (10) day period immediately following the Separation Date, the Company will reasonably cooperate with Employee to provide access to Employee's Company email account under supervision by the Company or a Company designee, for the sole purposes of (a) Employee's retrieval of a copy of her personal contacts (excluding any business contacts or contacts otherwise developed in the course of her employment with the Company), (b) Employee's retrieval of an electronic book from Tachi, and (c) to access and reset personal accounts connected to Company email.

11. Authorship and Contributions. The Company shall not be obligated to identify Employee as an author of or, except as set forth below in this Section 11, as a contributor to any manuscripts, papers, or other works of authorship that it may publish or submit for publication (any, a "Company Publication"), regardless of any contributions by Employee to such Company Publication. In the case of each Company Publication to which Employee made contributions under applicable scientific standards, the Company shall identify Employee as a contributor consistently across such Company Publications. The Company Publications, to which Employee would otherwise have authorship and acknowledgement rights due to Employee's contribution shall include the following language: (a) any Company Publications related to ATH-1017 preclinical studies or Phase 1a/b ATH-1017 studies: "We would like to thank Dr. Leen Kawas for her

5

support of the research teams involved in these studies and acknowledge her contributions to the conceptualization, design, and work on this study, including the qEEG and/or ERP (P300) methods."; (b) all other such Company Publications: "We would like to thank Dr. Leen Kawas for her support of the research teams involved in these studies and acknowledge her contributions to the conceptualization, design, and work on several Athira studies, including the study underlying this publication." Employee hereby waives any and all intellectual property rights (including copyright, rights of attribution, authorship or moral rights) with respect to any Company Publication that complies with this Section and agrees that she shall not challenge the authorship or provenance of any Company Publication in any forum that includes acknowledgement language required by this Section.

12. <u>No Cooperation</u>. Subject to Section 21 below governing Protected Activity, Employee agrees that Employee will not knowingly encourage, counsel, or assist any attorneys or their clients in the presentation or prosecution of any disputes, differences, grievances, claims, charges, or complaints by any third party against any of the Releasees, unless under a subpoena or other court order to do so. Employee agrees both to immediately notify the Company upon receipt of any such subpoena or court order, and to furnish, within three (3) business days of its receipt, a copy of such subpoena or other court order. If approached by anyone for counsel or assistance in the presentation or prosecution of any disputes, differences, grievances, claims, charges, or complaints against any of the Releasees, Employee shall state no more than that Employee cannot provide counsel or assistance.

13. <u>Nondisparagement</u>. Employee agrees to refrain from any disparagement, defamation, libel, or slander of any of the Company and its current and former officers and directors, and agrees to refrain from any tortious interference with, in each case, their contracts and relationships. The Company agrees to refrain from any disparagement, defamation, libel, or slander of Employee, and to refrain from any tortious interference with her contracts and relationships; provided, however, that the obligations in this sentence shall be limited to the current officers and directors of the Company as of the Separation Date, and in each case only for so long as they remain engaged by the Company in such capacity. Employee shall direct any inquiries by potential future employers to the Company's human resources department, which shall respond with a statement mutually agreed to by the Parties in a form satisfactory to the Company. The Company and Employee agree that a Company approved communication will be sent from Employee to employees at the Company regarding Employee's departure from the Company. In any event, the Company shall determine the timing of any necessary public disclosures. Neither Employee nor any person acting on behalf of or in concert with Employee shall make any public disclosure or engage in a communication likely to result in public disclosure regarding Employee's separation from the Company, the findings of the special committee or any related topic prior to the Company's public disclosure thereof.

14. <u>Cooperation with Company</u>. Employee agrees to provide reasonable cooperation and assistance to the Company in the transition of Employee's role and in the resolution of any matters in which Employee was involved during the course of Employee's employment, or about which Employee has knowledge, and in the defense or prosecution of any investigations, audits, claims or actions now in existence or which may be brought or threatened in the future against or on behalf of the Company, including any investigations, audits, claims or actions involving or against its officers, directors and employees. Employee's cooperation with such matters shall include, without limitation, being available to consult with the Company regarding matters in which Employee has been involved or has knowledge; to reasonably assist the Company in securing its intellectual property rights; to reasonably assist the Company in preparing for any proceeding (including, without limitation, depositions, mediations, hearings, settlement negotiations, discovery conferences, arbitration, or trial); to provide affidavits reflecting truthful written testimony; to assist with any audit, inspection, proceeding or other inquiry; and to act as a witness to provide truthful testimony in connection with any investigation, audit, mediation, litigation or other legal proceeding affecting the Company. The Company agrees to provide Employee with reasonable notice of any activities requested in connection with this Section 14, to reasonably accommodate Employee with respect to scheduling, and to reimburse Employee for any reasonable, preapproved travel expenses related to such activities. Employee

6

agrees to keep the Company's Human Resource department apprised of employee's current contact information, including telephone numbers, work address, home address, and email address(es), and to reasonably promptly respond to communications from the Company in connection with this Section 14. Employee understands and agrees that this provision requires Employee's cooperation with the Company, but is not intended to have any influence whatsoever on any specific outcome in any matter, and Employee is expected at all times to provide truthful testimony and responses in connection with any matter. Employee understands and agrees that Employee is not otherwise entitled to any additional compensation for such cooperation, beyond the payments and consideration provided under this Agreement.

15. <u>Breach</u>. In addition to the rights provided in the "Attorneys' Fees" section below, Employee acknowledges and agrees that any material breach of this Agreement or of any provision of the Confidentiality Agreement shall entitle the Company immediately to recover and/or cease providing the consideration provided to Employee under this Agreement and to obtain damages, provided, however, that the Company shall not recover One Hundred Dollars ($100.00) of the consideration already paid pursuant to this Agreement, and such amount shall serve as full and complete consideration for the promises and obligations assumed by Employee under this Agreement and the Confidentiality Agreement.

16. <u>No Admission of Liability</u>. Employee understands and acknowledges that this Agreement constitutes a compromise and settlement of any and all actual or potential disputed claims by Employee. No action taken by the Company hereto, either previously or in connection with this Agreement, shall be deemed or construed to be (a) an admission of the truth or falsity of any actual or potential claims or (b) an acknowledgment or admission by the Company of any fault or liability whatsoever to Employee or to any third party.

17. <u>Costs</u>. The Parties shall each bear their own costs, attorneys' fees, and other fees incurred in connection with the preparation of this Agreement.

18. <u>ARBITRATION</u>. THE PARTIES AGREE THAT ANY AND ALL DISPUTES ARISING OUT OF THE TERMS OF THIS AGREEMENT, THEIR INTERPRETATION, EMPLOYEE'S EMPLOYMENT WITH THE COMPANY OR THE TERMS THEREOF, AND ANY OF THE MATTERS HEREIN RELEASED, SHALL BE SUBJECT TO BINDING ARBITRATION UNDER THE FEDERAL ARBITRATION ACT (THE "FAA"). THE FAA'S SUBSTANTIVE AND PROCEDURAL RULES SHALL GOVERN AND APPLY TO THIS ARBITRATION AGREEMENT WITH FULL FORCE AND EFFECT, AND ANY STATE COURT OF COMPETENT JURISDICTION MAY STAY PROCEEDINGS PENDING ARBITRATION OR COMPEL ARBITRATION IN THE SAME MANNER AS A FEDERAL COURT UNDER THE FAA. EMPLOYEE AGREES THAT, TO THE FULLEST EXTENT PERMITTED BY LAW, EMPLOYEE MAY BRING ANY SUCH ARBITRATION PROCEEDING ONLY IN EMPLOYEE'S INDIVIDUAL CAPACITY. ANY ARBITRATION WILL OCCUR IN KING COUNTY, WASHINGTON, BEFORE JAMS, PURSUANT TO ITS EMPLOYMENT ARBITRATION RULES & PROCEDURES ("JAMS RULES"), EXCEPT AS EXPRESSLY PROVIDED IN THIS SECTION 18. THE PARTIES AGREE THAT THE ARBITRATOR SHALL HAVE THE POWER TO DECIDE ANY MOTIONS BROUGHT BY ANY PARTY TO THE ARBITRATION, INCLUDING MOTIONS FOR SUMMARY JUDGMENT AND/OR ADJUDICATION, AND MOTIONS TO DISMISS AND DEMURRERS, APPLYING THE STANDARDS SET FORTH UNDER THE WASHINGTON CIVIL RULES. THE PARTIES AGREE THAT THE ARBITRATOR SHALL ISSUE A WRITTEN DECISION ON THE MERITS. THE PARTIES ALSO AGREE THAT THE ARBITRATOR SHALL HAVE THE POWER TO AWARD ANY REMEDIES AVAILABLE UNDER APPLICABLE LAW, AND THAT THE ARBITRATOR MAY AWARD ATTORNEYS' FEES AND COSTS TO THE PREVAILING PARTY, WHERE PERMITTED BY APPLICABLE LAW. THE ARBITRATOR MAY GRANT INJUNCTIONS AND OTHER RELIEF IN SUCH DISPUTES. THE ARBITRATOR SHALL APPLY SUBSTANTIVE WASHINGTON LAW TO ANY DISPUTE OR CLAIM. THE DECISION OF THE ARBITRATOR SHALL BE FINAL, CONCLUSIVE, AND BINDING ON THE PARTIES TO THE ARBITRATION. THE PARTIES AGREE THAT THE

7

PREVAILING PARTY SO THAT ARBITRATION SHALL BE ENFORCEABLE IN ANY COURT OF COMPETENT JURISDICTION TO ENFORCE THE ARBITRATION AWARD. THE PARTIES TO THE ARBITRATION SHALL EACH PAY AN EQUAL SHARE OF THE COSTS AND EXPENSES OF SUCH ARBITRATION, AND EACH PARTY SHALL SEPARATELY PAY FOR ITS RESPECTIVE COUNSEL FEES AND EXPENSES; PROVIDED, HOWEVER, THAT THE ARBITRATOR SHALL AWARD ATTORNEYS' FEES AND COSTS TO THE PREVAILING PARTY, EXCEPT AS PROHIBITED BY LAW. THE PARTIES HEREBY AGREE TO WAIVE THEIR RIGHT TO HAVE ANY DISPUTE BETWEEN THEM RESOLVED IN A COURT OF LAW BY A JUDGE OR JURY. NOTWITHSTANDING THE FOREGOING, THIS SECTION WILL NOT PREVENT EITHER PARTY FROM SEEKING INJUNCTIVE RELIEF (OR ANY OTHER PROVISIONAL REMEDY) FROM ANY COURT HAVING JURISDICTION OVER THE PARTIES AND THE SUBJECT MATTER OF THEIR DISPUTE RELATING TO THIS AGREEMENT AND THE AGREEMENTS INCORPORATED HEREIN BY REFERENCE. SHOULD ANY PART OF THE ARBITRATION AGREEMENT CONTAINED IN THIS PARAGRAPH CONFLICT WITH ANY OTHER ARBITRATION AGREEMENT BETWEEN THE PARTIES, THE PARTIES AGREE THAT THIS ARBITRATION AGREEMENT SHALL GOVERN.

19. <u>Tax Consequences</u>. The Company makes no representations or warranties with respect to the tax consequences of the payments and any other consideration provided to Employee or made on Employee's behalf under the terms of this Agreement. Employee agrees and understands that Employee is responsible for payment, if any, of local, state, and/or federal taxes on the payments and any other consideration provided hereunder by the Company and any penalties or assessments thereon. Employee further agrees to indemnify and hold the Releasees harmless from any claims, demands, deficiencies, penalties, interest, assessments, executions, judgments, or recoveries by any government agency against the Company for any amounts claimed due on account of (a) Employee's failure to pay or delayed payment of, federal or state taxes, or (b) damages sustained by the Company by reason of any such claims, including attorneys' fees and costs. All payments made pursuant to this Agreement will be subject to withholding of applicable taxes.

20. <u>Authority</u>. The Company represents and warrants that the undersigned has the authority to act on behalf of the Company and to bind the Company and all who may claim through it to the terms and conditions of this Agreement. Employee represents and warrants that Employee has the capacity to act on Employee's own behalf and on behalf of all who might claim through Employee to bind them to the terms and conditions of this Agreement. Each Party warrants and represents that there are no liens or claims of lien or assignments in law or equity or otherwise of or against any of the claims or causes of action released herein.

21. <u>Protected Activity Not Prohibited</u>. Employee understands that nothing in this Agreement shall in any way limit or prohibit Employee from engaging in any Protected Activity. For purposes of this Agreement, "Protected Activity" shall mean filing a charge, complaint, or report with, or otherwise communicating, cooperating, or participating in any investigation or proceeding that may be conducted by, any federal, state or local government agency or commission, including the Securities and Exchange Commission, the Equal Employment Opportunity Commission, the Occupational Safety and Health Administration, and the National Labor Relations Board ("Government Agencies"). Employee understands that in connection with such Protected Activity, Employee is permitted to disclose documents or other information as permitted by law, and without giving notice to, or receiving authorization from, the Company. Notwithstanding the foregoing, Employee agrees to take all reasonable precautions to prevent any unauthorized use or disclosure of any information that may constitute Company confidential information to any parties other than the Government Agencies. Employee further understands that "Protected Activity" does not include the disclosure of any Company attorney-client privileged communications or attorney work product. Any language in the Confidentiality Agreement regarding Employee's right to engage in Protected Activity that conflicts with, or is contrary to, this paragraph is superseded by this Agreement. In addition, pursuant to the Defend Trade Secrets Act of 2016, Employee is notified that an individual will not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that (a) is made in confidence to a federal, state, or local government official (directly or indirectly) or to an attorney *solely* for the purpose of

8

reporting or investigating a suspected violation of law, or (b) is made in a complaint or other document filed in a lawsuit or other proceeding, if (and only if) such filing is made under seal. In addition, an individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the individual's attorney and use the trade secret information in the court proceeding, if the individual files any document containing the trade secret under seal and does not disclose the trade secret, except pursuant to court order. Finally, nothing in this Agreement constitutes a waiver of any rights Employee may have under the Sarbanes-Oxley Act or Section 7 of the National Labor Relations Act.

22. No Representations. Employee represents that Employee has had an opportunity to consult with an attorney, and has carefully read and understands the scope and effect of the provisions of this Agreement. Employee has not relied upon any representations or statements made by the Company that are not specifically set forth in this Agreement.

23. Section 409A. It is intended that this Agreement comply with, or be exempt from, Code Section 409A and the final regulations and official guidance thereunder ("Section 409A") so that none of the payments or benefits to be provided under this Agreement will be subject to the additional tax imposed under Section 409A and any ambiguities herein will be interpreted to so comply and/or be exempt from Section 409A. Each payment and benefit to be paid or provided under this Agreement is intended to constitute a series of separate payments for purposes of Section 1.409A-2(b)(2) of the Treasury Regulations. Payments under Section 1.a. of this Agreement will be made no later than March 15, 2022. The Company and Employee will work together in good faith to consider either (i) amendments to this Agreement; or (ii) revisions to this Agreement with respect to the payment of any awards, which are necessary or appropriate to avoid imposition of any additional tax or income recognition prior to the actual payment to Employee under Section 409A. In no event will the Releasees have any responsibility, liability or obligation to reimburse, indemnify or hold harmless Employee or any other person for any taxes penalties or interest that may be imposed, or other costs that may be incurred, by Employee or any other person as a result of Section 409A.

24. Severability. In the event that any provision or any portion of any provision hereof or any surviving agreement made a part hereof becomes or is declared by a court of competent jurisdiction or arbitrator to be illegal, unenforceable, or void, this Agreement shall continue in full force and effect without said provision or portion of provision.

25. Attorneys' Fees. In the event that either Party brings an action to enforce or effect its rights under this Agreement, the prevailing Party shall be entitled to recover its costs and expenses, including the costs of mediation, arbitration, litigation, court fees, and reasonable attorneys' fees incurred in connection with such an action.

26. Entire Agreement. This Agreement represents the entire agreement and understanding between the Company and Employee concerning the subject matter of this Agreement and Employee's employment with and separation from the Company and the events leading thereto and associated therewith, and supersedes and replaces any and all prior agreements and understandings concerning the subject matter of this Agreement and Employee's relationship with the Company, including, for example, the Employment Letter and the Severance Agreement (except as provided in this sentence), but with the exception of the following (each of which are incorporated by reference herein and remain in full force and effect as may be modified under this Agreement): the Confidentiality Agreement, the Indemnification Agreement, Section 5.3 ("COBRA Severance Limitations") and Section 6 ("Limitation on Payments") of the Severance Agreement, the Stock Agreements, and Sections 7, 8, 10, and 11 of the Employment Letter.

27. No Oral Modification. This Agreement may only be amended in a writing signed by Employee and the Company's Chief Executive Officer.

9

28. Governing Law. This Agreement shall be governed by the laws of the State of Washington, without regard to choice-of-law provisions. Employee consents to personal and exclusive jurisdiction and venue in the State of Washington.

29. Effective Date. Employee understands that this Agreement shall be null and void if not executed by Employee at or before 6:30 PM Pacific Daylight Time on October 18, 2021. This Agreement will become effective on the date it has been signed by both Parties (the "Effective Date").

30. Counterparts. This Agreement may be executed in counterparts and by facsimile, and each counterpart and facsimile shall have the same force and effect as an original and shall constitute an effective, binding agreement on the part of each of the undersigned.

31. Voluntary Execution of Agreement. Employee understands and agrees that Employee executed this Agreement voluntarily, without any duress or undue influence on the part or behalf of the Company or any third party, with the full intent of releasing all of Employee's claims against the Company and any of the other Releasees. Employee acknowledges that:

(a)   Employee has read this Agreement;

(b)   Employee has been represented in the preparation, negotiation, and execution of this Agreement by legal counsel of Employee's own choice or has elected not to retain legal counsel;

(c)   Employee understands the terms and consequences of this Agreement and of the releases it contains;

(d)   Employee is fully aware of the legal and binding effect of this Agreement; and

(e)   Employee has not relied upon any representations or statements made by the Company that are not specifically set forth in this Agreement.

IN WITNESS WHEREOF, the Parties have executed this Agreement on the respective dates set forth below.

**LEEN KAWAS, an individual**

Dated: October 18, 2021

/s/ Leen Kawas
_____
Leen Kawas

**ATHIRA PHARMA, INC.**

Dated: October 18, 2021

By:   /s/ Mark Litton
_____
Mark Litton

10

**EMPLOYEE'S OPTIONS AS OF THE SEPARATION DATE**

**EMPLOYEE'S OPTIONS**

| Date of Grant | Plan Under Which Option Was Granted | Number of Shares Vested as of Separation Date |
|---|---|---|
| 8/29/2014 | 2014 Plan | 25,220 |
| 8/29/2014 | 2014 Plan | 50,440 |
| 10/24/2015 | 2014 Plan | 151,320 |
| 01/22/2018 | 2014 Plan | 63,050 |
| 12/18/2018 | 2014 Plan | 21,016 |
| 09/17/2020 | 2020 Plan | 52,489 |
| 02/18/2021 | 2020 Plan | 0 |
| | **Total:** | **363,535** |



**Athira Pharma Announces Leadership Changes;**

**Mark Litton, Ph.D., M.B.A. Named
President and Chief Executive Officer; Rachel Lenington, M.B.A. Named Chief
Operating Officer**

- *Special Committee of the Board of Directors has concluded its investigation of Dr. Leen Kawas's Doctoral Research*

- *Conference call to be held October 21, 2021 at 4:30 pm ET*

**BOTHELL, WA, October 21, 2021** — <u>Athira Pharma, Inc</u>. (NASDAQ: ATHA), a late clinical-stage biopharmaceutical company focused on developing small molecules to restore neuronal health and stop neurodegeneration, today announced the appointment of Mark Litton, Ph.D., M.B.A. as Chief Executive Officer of Athira. Dr. Litton succeeds Dr. Leen Kawas, who has resigned from her position as the Company's President and Chief Executive Officer and as a member of the Company's Board of Directors. Dr. Litton will also join the Company's Board of Directors. Rachel Lenington, M.B.A., the Company's Chief Technology Officer and Head of Product Development Strategy, has been appointed as the Company's Chief Operating Officer.

"*We are fortunate to have executives of the caliber of Dr. Litton and Ms. Lenington to lead Athira at this pivotal time,*" said Kelly A. Romano, Chair of the Board of Directors of Athira. "*Dr. Litton has demonstrated exemplary leadership of the Athira team since joining the Company in July 2019, and especially since assuming day-to-day leadership responsibilities* in June."

"*The Company and Dr. Kawas agreed it is in Athira's best interest to enter this critical next chapter under new leadership. Dr. Kawas's actions at Washington State University took place many years ago and did not involve ATH-1017, Athira's lead development candidate,*" Ms. Romano continued. "*We thank Dr. Kawas for her unwavering focus seeking to make a meaningful difference for Alzheimer's patients and their caregivers.*"

"*The goal of Athira has always been developing therapies that can reverse the effects of neurodegenerative diseases,*" stated Dr. Kawas. "*This talented team has accomplished significant milestones on the path to realizing this goal and I remain confident in the Company's ability to realize its mission and bring the Company's lead development candidates to market.*"



*"We are confident in the therapeutic potential of ATH-1017 for treating dementia, and I am honored to receive this opportunity to lead Athira forward along with our dedicated team to help make life better for all our loved ones suffering from these debilitating diseases,"* said Dr. Litton.

*"Athira remains absolutely committed to the integrity of scientific research in its mission to restore neuronal health for those suffering from neurological diseases, so that patients can regain their memories, lives, and family relationships,"* said Ms. Romano.

The Company also announced that its Board of Directors has concluded its independent special committee's investigation of allegations raised regarding doctoral research by Dr. Kawas conducted while a graduate student at Washington State University ("WSU").

The special committee's primary finding was that Dr. Kawas altered images in her 2011 doctoral dissertation and in at least four research papers that she co-authored while a graduate student at WSU, published from 2011 to 2014.

The Company's lead development candidate, ATH-1017 is a novel small molecule in late-stage clinical development and not the subject of Dr. Kawas's doctoral research. Athira was issued a patent in the U.S. covering ATH-1017 in June 2021, and the special committee found that neither this patent nor the underlying patent application cites any of the papers the special committee found contained images altered by Dr. Kawas.

As the Company has previously disclosed, the results of its Phase 1a/b trial of ATH-1017 demonstrated a statistically significant improvement in Event-Related Potential (ERP) P300 latency, an objective measure of working memory processing speed, in patients with Alzheimer's disease following multiple dose treatments with ATH-1017 compared with those receiving placebo. The Phase 1a/b trial was conducted by an independent contract research organization, Biotrial. QACV Consulting, an independent auditing firm, recently confirmed the GCP compliance and data management quality of this Phase 1a/b trial.

ATH-1017 is currently being studied in a double-blind, placebo-controlled Phase 2 and, potentially pivotal, double-blind, placebo-controlled Phase 2/3 clinical trial. These trials are currently enrolling over 375 patients to further evaluate the safety and the impact of ATH-1017 on cognition in mild-moderate Alzheimer's patients over six months.

**Conference Call Information**

Athira will host a conference call today. Details as follows:

Date: October 21, 2021
Time: 1:30 p.m. Pacific / 4:30 p.m. Eastern
Toll-free: (833) 614-1520
International: (516) 575-8710
Conference ID: 8695132
Webcast URL: https://edge.media-server.com/mmc/p/aa76h742



The archived audio webcast will be available on the Investor Relations/Events & Presentations section of the Athira website https://investors.athira.com/news-and-events/events-and-presentations approximately two hours after the event and will be available for replay for at least 30 days after the event.

**About ATH-1017**

ATH-1017, Athira's lead therapeutic candidate, is a positive modulator of HGF/MET. ATH-1017 is a prodrug that is administered via subcutaneous injection in its inactive form and rapidly converted in plasma to an active tyrosine metabolite (dihexa). Since 2018, ATH-1017 has been assessed in multiple preclinical and clinical studies by Athira and by its third-party contractors. Studies performed by third parties sponsored by Athira regarding ATH-1017's safety profile and treatment potential include the following:

- A non-clinical study in an Alzheimer's disease (AD) animal model (APP1/PS1), which showed that ATH-1017 treatment increased the qEEG gamma power that is associated with cognitive processing and memory.

- IND enabling studies including nonclinical GLP long-term toxicology and safety pharmacology studies performed by independent contract research organizations with validated methods and audited reports.

- A Phase 1a/b clinical trial in healthy young, healthy elderly, and AD subjects, in which ATH-1017 was shown to be well-tolerated with no serious adverse events and demonstrated statistically significant improvement in Event-Related Potential, or ERP. ERP P300 latency, an objective measure of working memory processing speed, was noted in patients with AD following multiple dose treatments with ATH-1017 compared with those receiving placebo ($P<0.05$). Recently, an independent auditing firm affirmed the GCP compliance and data management quality of the Phase 1a/b clinical trial.

**About Athira Pharma, Inc.**

Athira, headquartered in the Seattle area, is a late clinical-stage biopharmaceutical company focused on developing small molecules to restore neuronal health and stop neurodegeneration. We aim to provide rapid cognitive improvement and alter the course of neurological diseases with our novel mechanism of action. Athira is currently advancing its lead therapeutic candidate, ATH-1017, a novel small molecule for Alzheimer's and Parkinson's dementia. For more information, visit www.athira.com. You can also follow Athira on Facebook, LinkedIn and @athirapharma on Twitter and Instagram.



**Forward-Looking Statements**

This release contains "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933, Section 21E of the Securities Exchange Act of 1934 and the Private Securities Litigation Reform Act of 1995. These forward-looking statements are not based on historical fact and include statements regarding ATH-1017 as a potential treatment for Alzheimer's disease and other dementias; Athira's platform technology and potential therapies; and Athira's ability to advance its development candidates into later stages of development; and WSU's investigation. Forward-looking statements generally include statements that are predictive in nature and depend upon or refer to future events or conditions, and include words and phrases such as "may," "will," "should," "would," "expect," "plan," "believe," "intend," "pursue," "continue," and other similar expressions, among others. Any forward-looking statements are based on management's current expectations of future events and are subject to a number of risks and uncertainties that could cause actual results to differ materially and adversely from those set forth in or implied by such forward-looking statements. These risks and uncertainties include, but are not limited to, the preliminary data for Athira's ATH-1017 development candidate from the Phase 1a/b trials will not continue or persist; cessation or delay of any of the ongoing clinical trials and/or Athira's development of ATH-1017 may occur; future potential regulatory milestones of ATH-1017, including those related to current and planned clinical studies may be insufficient to support regulatory submissions or approval; the impact of the COVID-19 pandemic on Athira's business, research and clinical development plans and timelines and results of operations, including impact on Athira's clinical trial sites and contractors who act for or on Athira's behalf, may be more severe and more prolonged than currently anticipated, clinical trials may not demonstrate safety and efficacy of any of Athira's development candidates; Athira's assumptions regarding its planned expenditures and sufficiency of its cash, cash equivalents and investments to fund operations may be incorrect; Athira's research and development efforts and its ability to advance development candidates into later stages of development may fail; any one or more of Athira's development candidates may not be successfully developed, approved or commercialized; adverse conditions in the general domestic and global economic markets; regulatory uncertainty as a result of the new U.S. administration; regulatory agencies may be delayed in reviewing, commenting on or approving any of Athira's clinical development plans as a result of the COVID-19 pandemic, which could further delay development timelines; the impact of competition; the impact of expanded product development and clinical activities on operating expenses; impact of new or changing laws and regulations; as well as the other risks detailed in Athira's filings with the Securities and Exchange Commission. These forward-looking statements speak only as of the date hereof and Athira undertakes no obligation to update forward-looking statements. Athira may not actually achieve the plans, intentions, or expectations disclosed in its forward-looking statements, and you should not place undue reliance on the forward-looking statements.

# # #

**Investor & Media Contact**:

Julie Rathbun
Athira Pharma
Julie.rathbun@athira.com
206-769-9219