# EXHIBIT 1



Xue Hua

May 10

27 min read

# Why I Left Athira — Questions on Leen Kawas' Ousting

## Summary

Leen Kawas was ousted as Athira's CEO on October 21, 2021 over an allegation regarding altered images in her PhD research on Dihexa. It is a common misconception that this allegation is unrelated to Athira's ongoing programs. In fact, Dihexa (aka Fosgo-AM) is the active drug of Fosgonimeton (ATH-1017), and it is measured in patients' blood to assess the dose level for Fosgonimeton clinical trials. Therefore, Athira's lead program of Fosgonimeton depends on the scientific validity of Dihexa.

The scientific validity of Dihexa has been confirmed in multiple experiments performed at Athira since Kawas' PhD research ten years ago. Therefore in my view the right way — and the ethical way — to address the questions raised regarding her PhD research is to use available data that establishes the scientific validity of Dihexa and the integrity of the prior research. Doing so would not only have been the right thing to do, but it also would have avoided the costly and disruptive ousting of the CEO.

Despite her stellar performance as the CEO of Athira over the last 10 years, Kawas was dismissed over a mistake she made as a young and inexperienced graduate student. Based upon testimonial recently published by Prof. Joe Harding, Leen Kawas' PhD advisor and co-founder of Athira, it now appears that the mistake had been disclosed to Athira's Board back in 2015. More importantly, nothing about the young student's mistake ten years ago affects or impacts the conclusion of the research and testing that Athira did, which verified the science supporting the potential efficacy of Dihexa.

I left Athira in February 2022, as I strongly disagree with the Board's decision to dismiss Leen Kawas as the CEO, the rationale Athira provided to the public to purportedly justify her dismissal, and the lack of transition that resulted in growing leadership gaps. In this post, I aim to provide an evidence-based discussion to shed light on this significant corporate event that might have long-term implications, and to raise a few questions for the Athira Board and senior executives to consider.

# About Me And Why I Decided To Speak Up

I am the former Vice President of Clinical Development, Research at Athira. Until my resignation on February 18, 2022, I was directly responsible for leading and supervising the science and operations of all of Athira's clinical trials over the past six years, serving various functions across clinical research, clinical operations, drug safety, regulatory strategy, etc. I built and led the clinical team and directly contributed to three Investigational New Drug (IND) applications, six clinical trials, and I led the effort that secured $18 million in non-dilutive funding through grants received from the Alzheimer's Drug Discovery Foundation, the Alzheimer's Association, and the National Institute on Aging (NIA).

Those of you who know me and worked with me closely will understand I have put a lot of thought into my decision to speak up regarding these issues and did not make it lightly. I have written multiple study protocols and countless study documents, published numerous scientific papers with over 6,800 citations, and presented at scientific conferences, but I have never written a blog post — *this is the first*. My tenure at Athira involved six years of intense work. There was no time or energy to be wasted on corporate drama. I dedicated myself, as did many other Athirians, to the development of a program we all believe has the potential to make a real impact for the millions of patients who suffer from debilitating conditions like Alzheimer's and Parkinson's dementia.

I'd have preferred to spend my time applying my knowledge and working alongside the team on the Fosgonimeton (ATH-1017) studies. I believe in the Fosgonimeton program as a potential life-changing therapy for Alzheimer's disease and other neurodegenerative disorders. If the program is a success, you should know the people who dedicated their lifetime efforts to make this happen.

In my opinion, the handling of Athira's investigation regarding Leen Kawas and her subsequent dismissal fell below what scientific ethics called for and raises many

unanswered questions. I feel obligated to speak up as a trained scientist. The questions I am raising in this blog post require answers from the Athira Board and senior executives. **My actions are focused on the long-term success of Athira and its societal impact.**

> "There are risks and costs to action. But they are far less than the long range risks of comfortable inaction." — John F. Kennedy

# Fosgonimeton And Dihexa

Athira's lead drug candidate is **Fosgonimeton** (short name: Fosgo; aka ATH-1017), a prodrug of Fosgo-AM (aka **Dihexa** and ATH-1001). It is currently being evaluated in four active clinical trials including an open-label extension study (LIFT-AD; ACT-AD; SHAPE-Trial; open-label extension).



Fosgonimeton is a Dihexa prodrug.

Fosgonimeton activates the HGF/MET target only after converting to Dihexa, and it has no confirmed activity on its own. Dihexa is the active drug that delivers the therapeutic potential, and it is measured in patients' blood to assess the dose level for Fosgonimeton clinical trials. **Dihexa is Fosgo-AM — it is not only related to Fosgonimeton, it is the core active drug that delivers the therapeutic potential.**

> **Definition of prodrug**: "a pharmacologically inactive substance that is converted in the body (as by enzymatic action) into a pharmacologically active drug." — Merriam Webster

|  | Fosgonimeton | Fosgo-AM |
|---|---|---|
| Alternative names | ATH-1017, NDX-1017 | **Dihexa**, ATH-1001, NDX-1001 |
| U.S. Patent | US11021514 | US8598118 |
| Patented at | Athira | WSU |
| Inventors | Leen H. Kawas<br>Jasbir Singh<br>Lansing J. Stewart<br>William R. Baker | Joseph W. Harding<br>John W. Wright<br>Caroline C. Benoist<br>Leen H. Kawas<br>Gary A. Wayman |
| Activity | No confirmed activity; it converts to the active drug Dihexa (Fosgo-AM) upon subcutaneous injection. | It is the active drug that enters brain and activates target, i.e., MET phosphorylation as mediated by HGF. |

Facts of Fosgonimeton and Fosgo-AM (Dihexa)

# Athira Was Founded To Develop Dihexa For Its Therapeutic Applications

In 2011, Joe Harding, John (Jay) Wright, and Leen Kawas co-founded Athira to develop Dihexa for its therapeutic applications. Kawas is the lead inventor and was instrumental in the development of Fosgonimeton (ATH-1017), a prodrug of Dihexa to improve its solubility.

Between 2014 and 2021 when Leen Kawas assumed the CEO role, Athira has achieved numerous milestones under her hands-on leadership, with her direct and original contributions, including:

- In 2015, invented Fosgonimeton (ATH-1017) as the prodrug of Dihexa
- In 2015, raised seed round of $1.5 million with additional Washington State matched funding
- In 2017, raised $15 million, bringing total investment to $26 million.
- In 2017, FDA approved the investigational new drug (IND) application for Fosgonimeton and the Phase 1 clinical trial was initiated. The Phase 1 trial utilized innovative translational biomarkers of quantitative electroencephalogram (qEEG) and event-related potential (ERP) P300 to support CNS penetration and target

engagement, which led to dose optimization with the inclusion of Alzheimer's patients in early phase trials.

- In 2019, finalized the Phase 2/3 trial design of Fosgonimeton for the treatment of mild to moderate Alzheimer's diseased based on discussion with the FDA.
- In June 2020, Athira closed $85 million series B financing.
- In September 2020, Athira completed initial public offering (IPO) and follow-on financing. Total capital raised: around $400 million.
- In 2020, Athira launched LIFT-AD and ACT-AD trials despite the COVID pandemic severely disrupting clinical trial operations.
- In 2021, ACT-AD enrollment was completed; LIFT-AD enrollment exceeded the enrollment goals; two new trials were launched including the open-label extension study and SHAPE-Trial (Fosgonimeton for the treatment of Parkinson's disease dementia and dementia with Lewy bodies).
- From 2016 to 2021, built and expanded the drug discovery pipelined that resulted in new molecule like ATH-1020 and ATH-1019.

Please read this article from Washington State University (WSU) to learn the history of the Dihexa research, and why *"Effectively and selectively controlling growth factor function is one of the holy grails of medicine"*. WSU holds the Dihexa patent, which is licensed to Athira exclusively.

# June 17, 2021, The Allegation And The Right Way To Address The Allegation

On June 17, 2021, I learned the news about Leen Kawas being placed on leave from a press release sent through a company public email. Like most employees, I was shocked to learn about such an important company event from a press release. A STAT news article published on the same day provided more details on the allegation regarding image alteration during Kawas' PhD as related to Dihexa.

In the week after June 17, without knowing that the allegation had previously been raised, disclosed to the Athira Board and fully addressed in 2015/2016 (detailed in the next section), I led the communications to the scientific and clinical research community, explaining the facts and data to support the scientific validity of the Fosgonimeton

(ATH-1017) program. The key data is Dihexa (Fosgo-AM)'s ability to activate the HGF/MET target (i.e., MET phosphorylation as mediated by HGF), an experiment that was routinely performed at Athira with raw data to back it up. I was able to address any concerns and maintain confidence in the program within a week in June 2021. This was my personal initiative with no direction from the senior executives or Athira Board, and it directly contributed to meeting the recruitment goals of ACT-AD and LIFT-AD in 2021.

**The company-conducted experiments established the potential therapeutic efficacy of Dihexa and directly replicated the findings in Kawas' PhD research relevant to Dihexa, completed well before 2021.** The company did not publicly disclose the data from these company-conducted experiments when it announced the results of the investigation overseen by a Special Committee of its Board in October 2021. However, it did recently present the Dihexa data under the name of Fosgo-AM at the ASENT conference in March 2022, including the key data of Dihexa (Fosgo-AM)'s ability to activate the HGF/MET target. None of the inventors of Dihexa were listed as co-authors or even acknowledged in the ASENT presentation, even though some of the animal studies referenced in the data were performed at WSU.



Dihexa (Fosgo-AM) positively modulates the HGF/MET system in vitro (source: Athira ASENT 2022 presentation, slide #8)

**The scientific validity of Dihexa is additionally supported by the Phase 1 clinical study of Fosgonimeton, completed in 2019 under Kawas direction and leadership.** The data from the Phase 1 study is published in a peer-reviewed publication at the Journal of Alzheimer's Disease. In addition to safety and tolerability, the Phase 1 study demonstrated a fast-onset normalization of ERP P300 latency in Alzheimer's patients, suggesting enhancement of synaptic function and potential procognitive effects.

When the allegation was brought forward in June 2021, the public demanded a clear answer to understand if Kawas' PhD research is related to ATH-1017, and if ATH-1017 is compromised as a result. As clearly stated by Avisol Capital Partners in their article published in Seeking Alpha,

> "The critical thing that investors want to know is this — they don't care much whether Ms. Kawas doctored a few images in a few papers a decade ago. They want to know, is this all related to ATH-1017?"

The same sentiment is reflected in the comment by Stifel analyst Paul Matteis, as quoted in a Barron's report:

> "We don't really know how to process this development. The scientific hypothesis behind Athira came out of the work [that] Dr. Kawas did in graduate school so there is risk here that whatever comes out of this investigation could have clear negative implications for how we/investors view the asset, and/or management credibility."

When the STAT news allegation was published and after Dr. Kawas was put on leave, Athira's senior executives and its Board of Directors faced a crossroads. They had firm, unimpeachable scientific data that established that, regardless of any alteration of images in prior publications regarding Kawas' PhD research, Dihexa — which is the critical pharmacologically active drug — did in fact produce the desired effect. The scientifically accurate and ethically appropriate response to the STAT allegation would be to defend the science underlying Dihexa. The inaccurate and misleading response would be to try and distance Athira's drug candidate, Fosgonimeton (ATH-1017) from Dihexa by creating a false public perception that Fosgonimeton is not related to and not dependent for its potential efficacy on Dihexa.

The Athira Board chose the latter approach. In Athira's SEC filings after June 2021, the company included a mixture of factually correct information and misleading information that obfuscated the relationship between Fosgonimeton and Dihexa — the subject of the STAT allegation. The company acknowledged that Fosgonimeton is a prodrug of Dihexa, but then misleadingly created the impression that Fosgonimeton is independent of and unrelated to Dihexa, or that the STAT allegation is unrelated to Athira's program. For example,

1. *"development of dihexa was discontinued" and "ATH-1017 was selected for clinical development because of its improved drug-like properties, including solubility and*

2. *pharmacokinetics, while retaining brain activity similar to that demonstrated by dihexa in animal models."* — Company 8-K, October 21, 2021

2. *"the conduct that was the subject of the allegations is not related to any of our current product candidates or ongoing clinical research"* — 2021 annual 10-K, March 28, 2022

3. In the Motion to Dismiss filed publicly in March 2022, Dihexa was referenced as *"a molecule from which the Company had since 'moved on'"*.

In light of the circumstance considering the ongoing allegation regarding Dihexa's validity, the relationship of Fosgonimeton and Dihexa should be unambiguously stated. Dihexa is the molecule Kawas studied and co-invented, and it was some of the prior research regarding Dihexa that was put directly at issue in the STAT allegation. Although the relationship of Fosgonimeton and Dihexa is indisputable, the company avoided a straightforward answer to the question how Kawas PhD research on Dihexa is related to its ongoing clinical program of Fosgonimeton.

The misperception that the allegation is unrelated to Athira's ongoing programs is reflected in media coverage, e.g., "Current CEO Mark Litton has previously said that Athira now uses a different molecule than the one Kawas studied" (source: Endpoint News, April 6, 2022).

In my view, the right way — and the ethical and straightforward way — to address the questions raised last year regarding Kawas' PhD research is to use available data that establishes the scientific validity of Dihexa and the integrity of the prior research. Doing so would not only have been the right thing to do, but it also would have avoided the costly and disruptive ousting of the CEO.

**Dihexa is Fosgo-AM, therefore closely related to Fosgonimeton (ATH-1017). Kawas' PhD research on Dihexa has been replicated by company-performed experiments with raw data, therefore the image alteration did not impact the scientific validity of Dihexa or Fosgonimeton.**

# The Athira Board Did Not Disclose Information On How The Allegation Was Handled In 2015/2016

According to Prof. Joe Harding's "Testimonial in support of Dr. Leen Kawas", posted on LinkedIn in April 2022, Dr. Kawas had previously acknowledged the image embellishment more than five years ago. And Athira's other co-founder had specifically discussed the issue with Athira's Board Chairman five years ago. There was never any claim by anyone that there had been any *new* image embellishment between 2015 and 2021. Leen Kawas promptly admitted to the mistake in 2015 and again in 2021. The handling of the two *identical* allegations could not have been more different however.

| Allegation 1.0 (2015) | Allegation 2.0 (2021 — same allegation as in 2015) |
|---|---|
| Leen Kawas promptly admitted to the image embellishment. | |
| Full disclosure to<br>• Athira Board Chair: John Fluke<br>• Athira co-founder: Jay Wright<br>• WSU department chair: Steve Simasko | Company press release<br>• Kawas was placed on leave immediately<br>• Kawas was not permitted to address the situation publicly |
| **Athira scientists replicated key experiments supporting the scientific validity of Dihexa**<br>• Athira scientist replicated the most critical Dihexa study (Benoist et al, 2014) to show its ability to activate the HGF/MET target, while being kept blind to the reason behind the request; Leen Kawas was not involved in the experiment and the data analysis<br>• Submitted replication data to Journal of Pharmacology and Therapeutics (JPET) | **Board conducted a 4-month investigation with no new findings**<br>• Avoided a straightforward answer how Kawas PhD research on Dihexa is related to its ongoing clinical program of Fosgonimeton<br>• Did not disclose the fact that Kawas' PhD research on Dihexa is supported and validated by in-house data<br>• Did not disclose that members of the Board and executive team had known about the same allegation for over five years<br>• Kawas was asked to resign |

How the allegation was handled in 2015/2016 vs. 2021

Prof. Joe Harding was Kawas' PhD advisor, emeritus professor, and a co-founder of Athira. He has first-hand knowledge and provided full context regarding the events.

I encourage you to read Prof. Harding's letter in its entirety. Below are summaries and quotes from his letter that address some important questions.

**In 2015, as Prof. Harding received an inquiry from the Journal of Pharmacology and Therapeutics (JPET), he made a full disclosure to all relevant parties, including a current Athira Board member — the Chairman of the Board back then.**

"In 2015, I received notice from the editor of The Journal of Pharmacology and Therapeutics (JPET) that there were questions regarding published Western blots in two papers. Specifically, it was alleged that Dr Kawas had cut and pasted images from multiple gels into what appeared to be single blots. When I learned of this, I did four things immediately. 1) I searched other papers that Leen coauthored for similar activity and found one more example of blot embellishment. I then informed the JPET. 2) I contacted my department chairman, Steve Simasko, of the issue as a means of informing WSU. 3) I called and informed John Fluke, the chairman of the board of then M3 Biotechnology, 4) I called and informed Jay Wright, the other co-founder of M3 Biotechnology and a coauthor on most of Leen's papers. Unfortunately, no one including myself, multiple coauthors, numerous manuscript reviewers, and other members of the laboratory group had ever noticed the altered blots. A couple weeks later when Leen had returned from visiting family in Jordan, John Fluke and I met with Leen where she immediately admitted embellishing the blot pictures."

**What Prof. Harding described below is the scientific way to address the allegation through replication, completed in 2016.**

"After discussions with Dr Simasko, John Fluke, and Jay Wright and based on our discussion with Leen it was decided to request from JPET the opportunity to summit new confirmatory data. In addition to informing the above-mentioned individuals it was necessary to involve members of my laboratory including, Kevin Church, now an Athira vice-president, who were charged with replicating studies relevant to Kawas et al., 2011. Those studies relevant to Benoist et al., 2014 were completed at Athira (M3 Biotechnology at the time). I asked Leen to have a scientist (Robert Taylor) at M3 repeat what I considered to be the most critical Dihexa study keeping herself separated both from the experiment and the data analysis and keeping Robert blind to the reason behind the request. As expected, the all the data was completely reproduced. This was no surprise since it had been reproduced in one form or another many times in my laboratory or at Athira as part of the drug development process and the identification of clinical leads. These new Western blot data, as well as corroborating ELISA data, were then submitted to JPET on April 7, 2016."

Prof. Harding's letter also offered an insight on Leen Kawas' motivation for embellishing the blots. It was a mistake made by a young and inexperienced scientist. **Most importantly, the image embellishment impacted some example illustrations, not the quantitative data used to draw scientific conclusions.**

> "My understanding of Leen's motivation for altering the blots is completely based on my discussions with her. As stated above, Leen readily admitted that she had embellished the images and further explained that she was attempting to have the gel pictures more closely reflect the mean values of the actual data. The bar graphs themselves depict the combined data from multiple replicates that have been quantitated by densitometry with a phosphoimager. Most importantly, there is no indication that these graphs were ever manipulated in anyway. In fact, in many instances, I personally saw the quantitative data come off the phosphoimager, yielding data that was faithfully presented in the appropriate publications. As such, I am confident that the core quantitative data represented in the bar graphs in the papers in question is totally accurate and was not altered in any way"

Prof. Harding explained the scientific impact of the mistake — **there is no material impact on the scientific validity of Dihexa, emphasizing a plethora of corroborating evidence produced by other laboratories and at Athira.** He also shared his personal views on the situation, Leen Kawas' leadership, and the future of Athira.

> "Leen's gel picture embellishments have been blown way out of proportion to their significance and in no way discount the scientific validity of her work and the subsequent development of ATH-1017 at Athira. This judgment is based on a plethora of corroborating evidence produced by other laboratories and at Athira. This was simply a foolish error of judgment by a young graduate student who mistakenly thought that her activity was appropriate."

> "In my view, Leen is a scientist of impeccable integrity with unmatched intelligence, creativity, drive, and business judgment as evidenced by her exemplary role as CEO at Athira."

> "I vehemently disagree with the decision of Athira's board to dismiss Leen over a misstep taken as a young graduate student almost a decade ago and something that had no bearing on her impeccable performance as Athira's CEO. In my mind, the entire situation regarding the blot pictures

> was a mountain out of a molehill; something I have articulated many times."

> "Leen is truly a singular talent whose capabilities are simply not replaceable. Thus, the expertise and vision that Athira has lost with her dismissal, in my opinion, casts doubt on Athira's future."

The Board's special committee investigation did not publicly disclose these important details regarding prior disclosure to the Athira Board in 2015/2016, the nature of the mistake, and its lack of material impact on the scientific conclusions of Kawas' PhD research.

**The way Joe Harding handled the allegation in 2015/2016 demonstrated what Athira could have (and should have) done in June 2021, when all the supportive data was readily available. If handled in a scientific way like Joe Harding did in 2015/2016 and I did in 2021 as described earlier, the crisis could have been over within a week.**

# Questions To The Athira Board And Senior Executives

I asked many questions internally during and after the investigation but did not get answers. So I left Athira, and now I'd like to publicly ask the Athira Board and senior executives to answer these questions. In my opinion, the answers to these questions determine the future of Athira.

## 1. Why did the Athira Board choose to not defend the scientific validity of Dihexa and the integrity of prior Dihexa research when it had all the scientific data to do so?

In my opinion, a responsible corporate fiduciary in the same position as Athira's Board would need to know and publicly disclose not only the extent to which there had been any image embellishment in Kawas' prior research, but even more importantly, whether that embellishment in any way impacted the scientific conclusions Athira had drawn from its prior work with the key pharmacologically active drug of the lead candidate it was developing. Any responsible corporate fiduciary like a Board Special Committee

would, when retaining an outside law firm to conduct an investigation, specifically request that exactly that issue be carefully analyzed.

The company has firm and unimpeachable scientific data that established that, regardless of any embellishment of images in prior publications regarding Kawas' PhD research, Dihexa — which is the critical pharmacologically active drug — did in fact produce the desired effect. Why did the Board then choose to not defend the science underlying Dihexa and instead to try to dissociate it from its current drug candidate?

## 2. Why did the Board choose not to disclose key facts regarding prior handling in 2015/2016?

The Athira Board appointed a special committee and started an investigation. The investigation took four months but did not disclose any new findings. Kawas admitted to the image alteration in 2015 and again in June 2021. According to Prof. Harding's letter, Athira's Board had known about the image embellishment for over five years by June 2021, which had been disclosed in 2015/2016 and addressed by submitting new replication data to demonstrate that the mistake did not impact the scientific conclusion of Dihexa and was therefore not of material impact. The information on prior handling in 2015/2016 was not disclosed as part of the investigation findings.

## 3. Why permit an allegation to stand that would ruin the reputation of the CEO and lead researcher as well as negatively impact the company?

Leen Kawas had an impeccable performance as the company CEO. She is a co-inventor of Dihexa and the lead inventor of Fosgonimeton (ATH-1017) as well as nearly all Athira patents to date. Leen Kawas' reputation is associated with the company after 10 years of building and leading Athira (2011–2021). From the views of patients, physicians, collaborators and investors, Leen Kawas and Athira are inseparable. In my opinion, the leadership change without clear justification has hurt the company image and reputation.

## 4. Why did the senior executives decide to remove Kawas' deserving authorship from the Phase 1 publication of Fosgonimeton (ATH-1017)?

Leen Kawas played a crucial role in the development of Fosgonimeton (ATH-1017), directly contributing to the Phase 1 clinical study including the conception, design, acquisition, analysis, and interpretation of data. It was her original idea to utilize translational biomarkers of quantitative electroencephalogram (qEEG) and event-related potential (ERP) P300, as well as the inclusion of Alzheimer's patients in early phase trials, which contributed to the accelerated clinical development of ATH-1017. Additionally, she drafted the work and revised it critically for important intellectual content as reflected in the language used in the manuscript, also reflected in investigator's brochure and various due diligence documents prepared for business and scientific purposes. She deserves to be a co-author, based on the ICMJE guidelines.

Athira excluded Kawas as a co-author on the Phase 1 publication regarding Fosgonimeton (ATH-1017), and only listed her under acknowledgement without describing the full scope of her contributions. I repeatedly protested this decision to no avail. In my opinion, Athira's exclusion of Leen Kawas as a co-author on the Phase 1 publication falls below scientific ethical standards that all scientists should aspire to. Please see the published Phase 1 paper here.

# Leen Kawas' CEO Performance

Leen Kawas drove company strategies and was deeply involved in all day-to-day operations. Her sudden departure left big shoes to fill — that in my opinion have not been filled — and the succession should have been carefully considered.

This article from Harvard Business Review (HBR), "What Sets Successful CEOs Apart", is relevant and perhaps explains some of the Board's views and actions.

> "In the more than two decades we've spent advising boards, investors, and chief executives themselves on CEO transitions, we have seen a fundamental disconnect between what boards think makes for an ideal CEO and what actually leads to high performance. That disconnect starts with an unrealistic yet pervasive stereotype, which is shaped in large part by the official bios of Fortune 500 leaders. It holds that a successful CEO is a charismatic six-foot-tall white man with a degree from a top university, who is a strategic visionary with a seemingly direct-to-the-top career path and the ability to make perfect decisions under pressure."

The HBR researchers found very few successful leaders who fit this stereotypical profile, and they went on to launch a 10-year study, the CEO Genome Project with the goal of identifying the specific attributes that differentiate high-performing CEOs.

Leen clearly does not fit the stereotype above, but she excels at all four behaviors that define successful leaders, and according to the research *this is quite rare*:

- **Deciding with speed and conviction:** Being decisive is Leen's core strength and she has empowered others to do the same. There are too many examples, so to list a few: (1) She created the prodrug strategy to solve the solubility challenge of Dihexa, which led to the clinical development of Fosgonimeton (ATH-1017). (2) She initiated the Drug Discovery Structure Activity (DDSA) campaign that diversified the discovery pipeline that led to new candidates like ATH-1020 and others. (3) She envisioned the translational research program that led to the use of qEEG and ERP as functional endpoints to evaluate CNS activities in response to treatment. (4) She advanced clinical trial design through innovation and encouraged the use of strategic endpoint like global statistical tests (GST) to achieve the goal of hybrid Phase 2/3 designs. (5) She set the vision and supported the implementation of the strategic outsourcing model, which unified clinical research and operational goals with an emphasis on high-quality data. All of these decisions and strategic directions Leen made over the years shaped the vision, strategy and operations at Athira.

- **Engaging for impact:** Leen set Athira's mission — "To restore lives by advancing bold therapies, thoughtfully and urgently". She interacted with key stake holders to fulfill this mission, and this include patients and caregivers, clinical research sites and investigators, payers, regulators, investors, and last but not least the Athira team. She set the vision for the company's patient-centered research program and she strove for affordable therapies to ensure accessibility of the drugs developed if proven effective. She built Athira to change people's lives.

- **Adapting proactively:** "Adaptable CEOs also recognize that setbacks are an integral part of changing course and treat their mistakes as opportunities to learn and grow." Under her leadership, mistakes were not punished, and people were encouraged to learn from them. Inaction was unacceptable. She encouraged the team to constantly challenge the industry status quo; this was reflected in how

we designed and executed the clinical studies, how we manufacture the drugs, and many other areas.

- **Delivering reliably:** When we started the first IND application for Fosgonimeton (ATH-1017) in 2017, Leen set a timeline of six months from start to finish. We had a team of six people at the time, and none of us had ever worked on an IND before. No one believed we could deliver under this seemingly impossible timeline. Leen supported and empowered the team, and we wrote the first IND in-house as supported by a few consultants, and delivered on time. People from outside the company would say they couldn't believe that we wrote this in-house as the quality is on par with any large established companies. This is just one of many examples of Leen supporting the team to achieve the unimaginable, with high quality and a sense of urgency for everything we did. Leen Kawas is the type of leader who doesn't just sit and talk, *she runs with the team*.

During my six years working at Athira, Leen promoted high standards for scientific integrity and research ethics. Leen is a leader who focuses on people. She was instrumental to Athira's patient-centered clinical research. She is a diligent and brilliant scientist with the mentality to openly acknowledge the unknowns and learn with the team. She built Athira based on a strong culture and shared values, and routinely places the need of others above her own. She operated Athira in a cost-effective way by innovating and optimizing the clinical development and operational planning. She made sure every dollar that an investor entrusted the company and the program with was put to good use. She has a unique blend of scientific insight and business acumen and built Athira as a science-driven company.

**By the time she was dismissed as the CEO of Athira, we were not only at the cusp of developing life-changing therapies, but also changing the industry in accelerating drug development through innovations in translational research, clinical trial designs and operations.**

> "Management is about persuading people to do things they do not want to do, while leadership is about inspiring people to do things they never thought they could." — Steve Jobs

# Conclusions

To conclude, Leen Kawas' PhD research on Dihexa laid the foundation for Athira's ongoing program of Fosgonimeton (ATH-1017). Dihexa (Fosgo-AM) is the active drug of Fosgonimeton, currently evaluated in clinical trials for the treatment of Alzheimer's and Parkinson's dementias. Kawas' PhD research on Dihexa is supported and validated by company-performed experiments.

Leen Kawas made a mistake over ten years ago as a young and inexperienced graduate student. She acknowledged and fixed her mistake with the support of her advisor and colleagues to the best extent possible, with proper disclosure to the university, Athira Board, and other key stakeholders more than five years ago.

The Athira Board had been sitting on the information of image alteration for over five years and did not act on it until June 2021. It was unclear why the Board did not take action in 2015 but did so in 2021. Within those past five years and collectively over the 10 years, Leen Kawas had an excellent track record serving as the CEO of Athira. She played a critical role in setting the company vision, raising capital, and driving program development, strategies, and operations; in my opinion, her dismissal without a formal transition has created immeasurable gaps. In my view, the Athira Board and senior executives did not act as a science-driven company in the handling of this allegation and have made new mistakes, which have not been acknowledged or addressed.

As Athira moves into new phases of the corporate and program development, the company will encounter new challenges. A successful biotech company needs to be **science-driven** to solve the biggest challenges in medicine, like finding a cure for Alzheimer's disease. There are over 200 failed clinical trials in global Alzheimer's research overall, and many were performed by established companies with enormous resources and experienced personnel. It is not the lack of resources that attributes to the two decades of failures, but the lack of critical thinking and the courage to challenge the industry status quo from how we understand the disease pathology, design the clinical trials, to operate the clinical trials that collect high-quality data to answer the scientific questions.

Now that Leen has moved on to start her new venture, in my opinion Athira needs to critically review and address the gaps created by this misstep, and restore the company aspiration to be purpose-driven, and fearlessly innovative to develop therapies that can reach and positively impact everyone.

# The Audience

I wrote this blog post for those of you,

- who care about Athira and its societal impact;
- who prefer to learn the facts and not just read the headlines;
- who value constructive criticism;
- who respect scientific integrity and ethics.

***Patients, caregivers and clinical trial investigators,*** who have trusted us and supported the program through your participation in the Fosgonimeton (ATH-1017) clinical trials. The recent allegation concerning the former CEO Dr. Leen Kawas that ended with her dismissal may have caused confusion for many of you. As you consider trial participation, it is important to understand the scientific validity of the research, and I hope to provide a clear answer.

***Scientists around the world,*** who have worked hard and contributed to groundbreaking discoveries in science that transform people's lives, but are not receiving the credits they deserve. Since the federal standards for protecting authorship are narrow and such governance for commercial companies is nearly nonexistent, the only way to raise awareness is to speak up publicly.

***Entrepreneurs:*** My father was a first-generation entrepreneur in China when he started his private business in 1987. At that time, nearly all businesses were state-owned. When he started his private business, he left the "golden bowl" job at a state-owned enterprise, and his first investment came from my grandmother. He started learning C/C++ on his own in his 50s and developed a business in computers and automation. He passed away during a business trip in 1995. I witnessed as a child what it takes to be an entrepreneur and build a company; indeed, he contributed his life to it. My father studied Physics at Peking University (1960–1966), one of the best universities in China. He remains to this day the only person from his hometown — a rural village outside Beijing — to attend Peking University. He never gave up when all the odds were against him. I am writing to acknowledge the efforts of all you entrepreneurs who fought hard and dedicated your lives to add value to society.

***The Athira team:*** Yes, this gets a bit controversial considering the sensitivity. Some of you were there at the beginning and we have shared memories. Many of you joined in 2021/2022 as we grew the team, and you had limited experience working with Leen or me. On October 21, 2021 after the public announcement of leadership change, I called Leen. The first thing she asked me was *"how is the team doing"*. I want to share memories and stories with you so you know the Leen I know and how she built Athira. I hope you will carry forward this important mission she started.

***The Society:*** As a society we have grown less tolerant of mistakes. Mistakes of all kinds should be stepping stones for success. Who hasn't made a mistake in their life? How we address the mistakes and how we learn from them are important aspects that define a person.



Xue Hua, PhD

# A Few Words About My Resignation

It was an extremely difficult decision for me to leave Athira, leaving behind the clinical team I built and cherished, the collaborations, and the Fosgonimeton program I believe will have a real impact on society. I was leading the clinical team and external collaborators to support the clinical trials. If I had left in October 2021 after the announcement of leadership change, the trials would have been at significant risk; I would not have done that. I stayed to support the team and programs on post-leadership change communications and to fulfill our commitment to patients and clinical trial sites. I worked closely with the clinical team, often 80–100 hours per week, and ensured timely completion of ACT-AD enrollment, exceeding the enrollment goal for LIFT-AD, launching the open-label extension, and starting the SHAPE-trial for the treatment of Parkinson's disease dementia and dementia with Lewy bodies. In 2021, the clinical goals accounted for more than 80% of the corporate milestones. Leen was not there with us for the second half of the year, however we were still working under Leen's

previous strategic direction and leadership. Like one employee said, each of us amplified the "inner Leen" within us, and we powered through.

I had several meetings with the CMO throughout the second half of 2021 and shared my points of view as well as my concerns, but my voice was often not heard. By December 2021, I felt the program was in a good place after we achieved nearly all the clinical goals and I could now leave with manageable impact. On January 7, 2022, I took the first available time option in the new year to notify the CMO about my plan to resign, and this provided an opportunity for the team to be restructured during the planned annual performance review. By midnight on February 18, 2022, I handed over my transition plan that detailed my tasks and the incoming assignments, which I had discussed in detail with my team over my six-week transition period.

I have received overwhelming support from my immediate team and external collaborators, who acknowledged my contributions over the years. Below are a few personal notes that warmed my heart during that difficult time.

> "Xue, one year as colleagues has felt like a decade. Your impact has led us to where we are now. Cheers to continuing to learn." — From a colleague

> "Dear Xue, I have learned so much from working with you in the past year. I appreciate your patience, encouragement as well as valuable feedback. You have been the force behind the trials and thank you for always being available for discussions and being open for suggestions." — From a colleague

> "Few people have the same dedication, patience, and work ethic that you have — it is simply amazing everything you have been able to accomplish in such a short amount of time. Athira has been extremely lucky to have you and you will be greatly missed, but I know you will be successful wherever you end up!" — From a colleague

> "You have been an integral part of my Athira experience from the very beginning. We have professionally worked closely together building our Phase 1 trial and interacted socially very closely as office mates at the UW. I have tremendous respect for your wisdom and dedication." — From a colleague

> "I will miss having the opportunity to work with you on this project. It has been so rewarding to see it finally come to the clinical trial stage! It will be

like a different team now, with both you and Leen gone." — From a site investigator

"I've really admired your leadership in the study. I hope this is a good move for you. Please let me know and where you land. It would be great to work together again." –From a site investigator

"This makes me sad but I know you will soar whatever you do. I wish you all the happiness!" — From a site investigator

"It has been a pleasure working with you and the (M3)/Athira team over the past few years. You can personally and collectively be proud of the milestones achieved in such important areas of unmet medical need. I wish you all the very best on your next adventure and indeed do hope that we will have other opportunities to collaborate again in the not too distant future." — From a collaborator

# Disclaimers

My blog post represents my personal opinions as a scientist. This blog post is created based on public-domain information. When I left Athira, I retained certain documents so that I could consult with my legal counsel, as I witnessed what I perceived as potential wrongdoings in authorship and inventorship, among other issues. I have an ongoing dispute with Athira regarding those documents, and I have not shared with any third party (other than my attorney) any Athira confidential documents or information. I also remain a shareholder of Athira due to stock that I received as employee compensation.