1

2

3

4

5

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

6

7

8

9

10

11

12

ANTONIO BACHAALANI NACIF;
WIES RAFI; and HANG GAO,
individually and on behalf of all others
similarly situated,

Plaintiffs,

v.

ATHIRA PHARMA, INC.; and LEEN
KAWAS, Ph.D.,

Defendants.

C21-0861 TSZ

ORDER AND JUDGMENT

13

14

15

16

17

18

19

20

21

22

THIS MATTER comes before the Court on (i) plaintiffs' motion, docket no. 134, for final approval of a proposed class settlement; (ii) a motion for attorneys' fees, litigation costs, and service awards, docket no. 131, brought by Class Counsel (the firms of Glancy Prongay & Murray LLP and Labaton Keller Sucharow LLP), liaison counsel (the firm of Rossi Vucinovich, P.C.), and counsel for plaintiff Hang Gao (the firm of Block & Leviton LLP); and (iii) a motion for attorneys' fees and litigation costs, docket no. 133, brought by counsel for movants Timothy Slyne and Tai Slyne (the firms of Keller Rohrback L.L.P. and Longman Law, P.C.). Having conducted a hearing on October 25, 2024 (the "Final Approval Hearing") and having reviewed all papers filed in connection with the motions, the Court enters the following Order and Judgment.

23

**Background**

This class action was commenced in June 2021 by Fan Wang and plaintiff Hang Gao, who were represented by the firms of Tousley Brain Stephens PLLC and Block & Leviton LLP (the "Block Firm"). *See* Compl. (docket no. 1). In August 2021, Timothy Slyne and Tai Slyne (collectively, the "Slynes") sought appointment as lead plaintiffs to represent a portion of the class proposed in the original complaint. *See* Slynes' Mot. (docket no. 32). By Order entered October 5, 2021, the Slynes' motion was denied, and the following individuals were appointed as co-lead plaintiffs: (i) Antonio Bachaalani Nacif; and (ii) Wies Rafi. Order at 6–9 (docket no. 60). Nacif's and Rafi's attorneys, the firms of Labaton Sucharow LLP (the "Labaton Firm") and Glancy Prongay & Murray LLP (the "Glancy Firm"), respectively, were appointed as lead counsel, and the firm of Rossi Vucinovich, P.C. (the "Rossi Firm") was appointed as one of two liaison counsel; the other liaison counsel has since withdrawn. *See id.* at 9; *see also* Notice of Withdrawal (docket no. 67).

On January 7, 2022, plaintiffs Nacif and Rafi filed their Consolidated Amended Complaint ("CAC"), docket no. 74, in which they asserted the following claims:

1. Violation of § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and of Rule 10b-5, 17 C.F.R. § 240.10b-5;

2. Violation of § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a);

3. Violation of § 11 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77k;

4. Violation of § 12(a)(2) of the Securities Act, 15 U.S.C. § 77$\ell$(a)(2); and

5. Violation of § 15 of the Securities Act, 15 U.S.C. § 77o.

1   The first, third, and fourth claims were asserted against all defendants, namely (a) Athira

2   Pharma, Inc. ("Athira"), (b) Leen Kawas, Ph.D., (c) Athira's Chief Financial Officer

3   ("CFO") Glenna Mileson, (d) Athira's Board of Directors members Joseph Edelman,

4   John M. Fluke, Jr., and James A. Johnson (collectively "the Directors"), and (e) the

5   underwriters for Athira's stock offerings, (i) Jefferies LLC, (ii) Goldman Sachs & Co.

6   LLC, (iii) Stifel, Nicolaus & Company, Incorporated, and (iv) JMP Securities LLC

7   (collectively, "the Underwriters").  The second and fifth claims were alleged against the

8   individual defendants (Kawas, CFO Mileson, and the Directors).  The various claims

9   concerned eleven (11) statements made in the prospectuses for Athira's initial public

10  offering ("IPO") and second public offering ("SPO") and in other materials filed with the

11  U.S. Securities and Exchange Commission ("SEC").  _See_ Order at 24–27 (docket no. 89).

12      By Order entered July 29, 2022, the Court dismissed, upon defendants' motion, all

13  claims in this matter except the third and fifth (Securities Act) claims, which remained

14  pending solely with respect to Statement 3 and against only Athira and Kawas.  _See id._ at

15  29–49.  Plaintiffs Nacif and Rafi were granted leave to file an amended complaint, but

16  they failed to do so by the deadline set by the Court.  _See_ Minute Order at ¶ 1 (docket

17  no. 91); _see also_ Order at 2–3 & 5–6 (docket no. 114) (concluding that plaintiffs Nacif's

18  and Rafi's "decision not to timely amend their operative pleading renders 'final' the

19  earlier dismissal without prejudice").  In February 2023, Nacif, Rafi, Athira, and Kawas

20  participated in mediation before Jed D. Melnick of JAMS, Inc., and in March 2023, these

21  parties advised the Court that they had reached a settlement.  _See_ Stip. Mot. at 1, ¶¶ 4–5

22  (docket no. 117).  In late April 2023, plaintiffs filed their first motion for preliminary

23

1  approval of a proposed settlement.  This first motion was deferred pending receipt of

2  additional information, *see* Minute Order (docket no. 119), and ultimately denied by

3  Order entered September 27, 2023, *see* Order (docket no. 123).

4  In refusing to preliminarily approve the initially proposed settlement, the Court

5  concluded that, because plaintiffs Nacif and Rafi were bound by their decision not to

6  replead the previously dismissed Exchange Act claims, their positions were not typical of

7  those of the absent putative class members, and that, because the only way that plaintiff

8  Nacif, who has no Securities Act claims, could recover from this lawsuit was through

9  settlement, his interests were antagonistic toward all those he sought to represent.  *See id.*

10  at 5–7.  The Court further reasoned that, because the proposed settlement established no

11  limit on the portion of the settlement proceeds from which class members who have no

12  viable Securities Act claims could recover, the Court could not certify that the proposed

13  settlement treated putative class members equitably relative to each other.  *Id.* at 7–9.

14  In December 2023, plaintiffs Nacif and Rafi, joined by plaintiff Gao, again sought

15  preliminary approval of a proposed settlement.  *See* Pls.' Renewed Mot. (docket no. 125).

16  To address the conflict of interest identified in the Court's September 2023 Order, Gao's

17  attorneys (Jacob Walker and Michael Gaines of the Block Firm) had participated in a

18  mediation session conducted by Jed Melnick on November 16, 2023, and they signed the

19  Amended Stipulation and Agreement of Settlement ("Settlement Agreement"), Ex. 1 to

20  Hoffman Decl. (docket no. 125-2), on Gao's behalf.  Order at 3 (docket no. 128) (citing

21  Melnick Decl. at 1 n.1 & ¶ 11 (docket no. 125-4) and Settlement Agreement at 40 (docket

22  no. 125-2 at 42)).  By Order entered February 15, 2024, the Court treated the renewed

23

motion for preliminary approval of a class settlement as seeking leave to amend to add

Gao as a named plaintiff, granted the request, and appointed Gao, along with Nacif and

Rafi, as Class Representatives for the following certified class and subclasses:

- a class of all persons and entities who or which purchased or otherwise acquired Athira Pharma, Inc. publicly traded common stock during the period from September 17, 2020, through June 17, 2021, inclusive (the "Class Period"), and were damaged thereby (the "Class");

- a subclass of all persons and entities who or which purchased or otherwise acquired Athira Pharma, Inc. publicly traded common stock during the period from September 17, 2020, through March 16, 2021, inclusive, and were damaged thereby (the "Securities Act Subclass"); and

- a subclass of all persons and entities who or which purchased or otherwise acquired Athira Pharma, Inc. publicly traded common stock during the period from March 17, 2021, through June 17, 2021, inclusive, and were damaged thereby (the "Exchange Act Subclass").

Order at 3–4 & 19 (docket no. 128); _see also_ _id._ at 22–23 (identifying persons and entities

that are excluded from the Class).

        The proposed settlement requires defendant Athira to deposit (or "cause to be

paid") into an escrow account the gross settlement amount of $10 million.  Settlement

Agreement at ¶ 8 (docket no. 125-2).  From this fund, attorneys' fees, litigation costs,

service awards, settlement administration fees, taxes, and escrow account fees are to be

deducted before the remaining balance, including accrued interest, is distributed.  _See_

Order at 4 (docket no. 128).  As a result of the November 2023 mediation, Melnick

opined that allocating at least 91.5% of the net settlement proceeds ("Net Amt.") to

Securities Act claims and a maximum of 8.5% of the Net Amt. to Exchange Act claims

was "fair and reasonable," and the Court has adopted the mediator's recommended

1  apportionment.  *See* *id.* at 4-6.  Plaintiffs propose to make payments to Class members in

2  accordance with a "Plan of Allocation," which is not itself a provision of the Settlement

3  Agreement and about which defendants have expressly disavowed any ability to object.

4  *See* *id.* at 4–5; *see also* Settlement Agreement at ¶ 21 (docket no. 125-2).

5         The Plan of Allocation contemplates that each Class member who timely submits

6  a valid claim form will receive a distribution amount ("Distrib. Amt.") that is the sum of

7  (i) a *pro rata* share for any recognized loss amount associated with Securities Act claims

8  ("Sec. RLA"), and (ii) a *pro rata* share for any recognized loss amount connected to

9  Exchange Act claims ("Ex. RLA").  *See* Order at 6–10 (docket no. 128).  The Plan of

10  Allocation's required computations may be expressed mathematically as follows:

$$\text{Distrib. Amt.} = 0.915 \times \text{Net Amt.} \times \left( \frac{\text{Sec. RLA}}{\sum \text{Sec. RLA}} \right) + 0.085 \times \text{Net Amt.} \times \left( \frac{\text{Ex. RLA}}{\sum \text{Ex. RLA}} \right),$$

13  where ∑ reflects the summation of all participating Class members' recognized loss

14  amounts.  *See* *id.* at 7.  The Plan of Allocation also envisions that, if funds remain in the

15  escrow account because checks were not delivered or not negotiated within nine months

16  after mailing, then either another round of distribution will occur or, if such effort would

17  not be cost effective, then the remaining balance will be remitted to the proposed *cy pres*

18  recipient, the Public Justice Foundation.  *Id.* at 10.

19  **Discussion**

20         The Court has previously expressed dissatisfaction with this "opt in" approach,

21  which binds Class members that do not opt out of the settlement, while offering them no

22  portion of the settlement proceeds if they do not return the requisite claim form.  *See*

23

ORDER AND JUDGMENT - 6

1   Minute Order at ¶ 1(c) (docket no. 119); _see also_ Order at 10–11 & n.9 (docket no. 123);

2   Order at 18 (docket no. 128).  To evaluate whether any of the anticipated problems with

3   an "opt in" method have come to fruition, the Court begins by considering how notice of

4   the proposed settlement was served, and then examines the responses of those who

5   received notice.

6   **A.    Notices**

7          According to Sarah Evans, a project manager with Strategic Claims Services

8   ("SCS"), which is the appointed Settlement Administrator, notices about the proposed

9   settlement were sent as follows:

| Putative Class Members | Number |
|---|---|
| Identified by Athira (and served by SCS via first-class mail) | 196 |
| Identified by Nominees[1] (and served by SCS via first-class mail) | 13,240 |
| Served by Nominees[1] | 12,195 |
| Served upon Direct Request to SCS (via first-class mail) | 1 |
| **TOTAL** | **25,632** |

14  Evans Decl. at ¶¶ 4–7 (docket no. 134-1).  When the proposed settlement was

15  preliminarily approved, the Class was estimated to include "approximately 30,000"

16  members and "likely more than 45,000."  _See_ Order at 11 (docket no. 128).  The number

17  of notices distributed by SCS (25,632) is believed to reflect a more accurate tally of Class

18  members, but the parties acknowledge that they cannot be certain all Class members have

19  been identified.  _See_ Pls.' Supp. (docket no. 150 at 1).

20

_____

21  [1] Nominees hold securities on behalf of others, and they include banks, brokerage companies,
    mutual funds, insurance companies, pension funds, and money managers.  Evans Decl. at ¶ 5
22  (docket no. 134-1).  SCS maintains a proprietary list of nominees.  _Id._

23

ORDER AND JUDGMENT - 7

1    Of the notices mailed, 1,255 were returned, but 55 were resent to forwarding

2  addresses provided by the United States Postal Service, and 669 were resent to updated

3  addresses obtained by skip-tracing, leaving 531 as undeliverable.  *See* Evans Decl. at ¶ 8

4  (docket no. 134-1).  Thus, of the 25,632 notices issued by SCS, roughly two percent (2%)

5  failed to reach the putative Class member.  According to SCS, this failure rate is not

6  unusual, and SCS has experienced a higher failure rate in other similar matters.  *See* SCS

7  Decls. (docket nos. 84-2 & 86) in *In re Peabody Energy Corp. Sec. Litig.*, S.D.N.Y. Case

8  No. 20-cv-8024 (indicating that 840 of 27,743 notices (3.03%) were undeliverable); SCS

9  Supp. Decl. (docket no. 142-1) in *In re TerraVia Holdings, Inc. Sec. Litig.*, N.D. Cal.

10  Case No. 16-cv-6633 (advising that 240 of 7,729 notices (3.1%) were undeliverable).

11    In addition to the above-described efforts, notices were published on the

12  Depository Trust Company's Legal Notice System, as well as in *Investor's Business*

13  *Daily* and via *PR Newswire*.  Evans Decl. at ¶¶ 9–10 (docket no. 134-1).  SCS has also

14  maintained a toll-free telephone number, monitored an email address, and established a

15  dedicated website.  *Id.* at ¶¶ 11–14 & Ex. C.  As of September 26, 2024, SCS had

16  received 99 emails, and the website had been viewed by 2,086 unique users.  *Id.* at ¶¶ 12

17  & 14.  Given the inherent lack of information concerning the probable number of Class

18  members, the Court is unable to compute the precise success rate for the method of

19  serving notices.  The Court nevertheless remains persuaded that the plan previously

20  approved, as implemented, provided the best notice practicable under the circumstances.

21  *See* Order at 23, ¶ 13 (docket no. 128).

22

23

**B.**    <u>**Responses**</u>

No objections to the proposed settlement or the proposed *cy pres* recipient were offered during the Final Approval Hearing.  The date and time of the hearing were announced in the Class notice and on the website maintained by the Settlement Administrator (www.AthiraSecuritiesSettlement.com).  *See* Exs. A & C to Evans Decl. (docket nos. 134-2 & 134-4).  The ZoomGov link, as well as the related meeting ID and passcode, via which individuals could virtually participate in the Final Approval Hearing, were available on the Settlement Administrator's website for ten (10) days preceding the hearing, *i.e.*, from October 15 until October 25, 2024.  The Court is satisfied that Class members were informed about the hearing and were offered a convenient means of accessing the proceedings.  At the Final Approval Hearing, however, no Class member, other than plaintiff Rafi, physically or virtually appeared.  *See* Minutes (docket no. 151).

In the declaration accompanying the motion for final approval of the proposed settlement, the Settlement Administrator reported receiving, to date, no objections and six (6) requests for exclusion, representing approximately 123.5 shares of Athira stock purchased during the Class Period.  Evans Decl. at ¶¶ 16–17 & Ex. D (docket nos. 134-1 & 135).  As of September 26, 2024, the Settlement Administrator had received 8,283 claim forms, of which 2,702 had been provisionally deemed valid, and 5,581 had been provisionally deemed deficient or ineligible.  *Id.* at ¶ 18.  No further explanation was provided, and the Court directed the Settlement Administrator to file a supplemental declaration.  *See* Minute Order at ¶ 1 (docket no. 136).  In response, the President of SCS offered certain updates and clarifications, *see* Mulholland Decl. at ¶¶ 5 & 8(a)–(g)

1  (docket no. 137), but those figures were subsequently revised via email to the Court on

2  the day before the Final Approval Hearing, _see_ Pls.' Supp. (docket no. 150), and the

3  reported numbers are now as follows (with the amount of any change shown in

4  parentheses):

| Status of Claim Forms | Number of Claim Forms | | Reason[2] |
|---|---|---|---|
| Provisionally Ineligible | 6,068 (-9) | 3,424 (+6) | shares were not purchased during the Class Period[6] |
| | | 2,799 (+13) | shares were purchased and sold before June 18, 2021[3] |
| | | 197 | shares were sold short |
| | | 98 | shares were acquired by gift, grant, or operation of law |
| | | 8 | shares are not Athira publicly-traded common stock |
| | | 4 | claim form is duplicative |
| Provisionally Deficient[4] | | 57 (-17) | lacking sufficient information or supporting documentation |
| Provisionally Valid | 2,227 (+11) | | |
| Total Number | 8,295 (+2) | | |

---

[2] Of the claim forms deemed provisionally ineligible or deficient, 1,057 presented more than one reason for considering the claim invalid. _See_ Mulholland Decl. at ¶ 9 (docket no. 137).

[3] Pursuant to the Plan of Allocation, the recognized loss amount for (i) shares purchased and sold prior to the close of U.S. financial markets on June 17, 2021, and (ii) shares purchased on or after June 18, 2021, is $0. _See_ Order at 7–8 (docket no. 128).

[4] With regard to the claim forms provisionally deemed deficient, the Settlement Administrator intends to offer each putative Class member an opportunity to cure, but it will not initiate this process until after any judgment in this matter becomes final. _See_ Mulholland Decl. at ¶ 19–21 (docket no. 137).

SCS's President, who has over 24 years of experience in administering securities class action settlements, has opined that the rate of claim forms provisionally deemed valid in this matter, roughly twenty-six percent (26%), is lower than typical, but not unusual given the length of the Class Period, the trading volume for Athira common stock, and the date of the first alleged corrective disclosure.  Mulholland Decl. at ¶¶ 1 & 17 (docket no. 137).  This explanation seems to ignore the extent to which the inversely-related proportion of claim forms provisionally deemed ineligible (over 72%) resulted from the lengthy and potentially confusing notice sent to putative Class members and/or the fairly onerous eight-page claim form, both of which have been of serious concern to the Court, _see_ Order at 14–18 (docket no. 128); _see also_ Minute Order at ¶ 1(a)–(d) (docket no. 130).  The Court now concludes, however, that the impact of any failure to fully review and/or comprehend the 23-page notice was the over, rather than under, submission of claim forms, and the Court is satisfied that neither the verbosity of the disbursed documents nor the burdensomeness of "opting in" posed any unreasonable or unconstitutional obstacle for Class members.

The ratio of claim forms submitted (8,291, not counting the four (4) duplicative forms) to notices disbursed (25,632) reflects a response rate of about thirty-two percent (32%).  According to Class Counsel, this response rate compares favorably to the response rates experienced by SCS in similar matters.  _See_ Pls.' Supp. (docket no. 150 at 3–4).  SCS's representative has indicated that the claim forms provisionally deemed valid represent approximately 14,430,720 damaged shares, apportioned as roughly 8.5 million in connection with Securities Act claims and 5.9 million in connection with Exchange

Act claims.  _See id._ (docket no. 150 at 4).  These figures reflect a relatively high percentage of the shares that plaintiffs' expert Zachary Nye, Ph.D. opined were damaged, _see_ Order at 9 n.8 (docket no. 128), as shown in the following table:

|  | Securities Act Claims | Exchange Act Claims |
|---|---|---|
| Damaged Shares Associated with Provisionally Valid Claim Forms | 8.5 million | 5.9 million |
| Nye's Estimate of Damaged Shares | 12.72 million | 8.64 million |
| Ratio of Claims to Estimated Total | 66.8% | 68.3% |

This information is consistent with the parties' representation that, historically, between 66% and 71% of the publicly-traded shares of Athira have been owned by institutions that must file a Form 13F with the SEC on a quarterly basis.  _See_ Order at 10 (docket no. 123).  Such institutions are likely to have had, during the relevant times, sufficient shares to be motivated to complete and return claim forms and to possess the documentation necessary to support them.  Being fully apprised with respect to the rate and nature of the responses of individuals and entities that received notice of the proposed settlement, the Court is satisfied that the "opt in" process was, in this matter, consistent with the requirements of Federal Rule of Civil Procedure 23(e) and with due process.

C.    **Fairness, Reasonableness, and Adequacy**

The Court remains persuaded that sufficient discovery and motion practice was conducted in this case and that Class Counsel has enough experience in similar matters to propose this settlement.  _See_ Order at 20 (docket no. 128).  When the Court preliminarily

1    approved the proposed settlement, no evidence existed of any fraud, collusion, over-

2    reaching, or disregard of the rights of absent Class members on the part of any party,

3    *see* *id.*, and since that time, no allegation of any improper conduct has been brought to the

4    Court's attention.  The proposed settlement is not obviously deficient and, in fact,

5    represents an extremely favorable result in light of the procedural posture of the claims,

6    most of which were dismissed on defendants' motion, and the significant risk that

7    plaintiffs would not prevail in dispositive motion practice or at trial.

8          The notice plan implemented by the Settlement Administrator was the best

9    practicable given the circumstances, and the responses of Class members who received

10   notice have been favorable, with no objections having been presented, and claim forms

11   associated with over 66% of the estimated total amount of damaged shares having been

12   submitted.  The "opt in" approach successfully gathered the information necessary to

13   distribute settlement proceeds to individuals and entities that at some point held or

14   perhaps still hold more than a majority of all shares of Athira common stock alleged to

15   have been damaged.  The apportionment proposed by the parties, with support from the

16   mediator, and adopted by the Court, is fair and treats equitably the Class members with

17   Securities Act claims and the Class members with Exchange Act claims, providing a

18   larger share of the net settlement proceeds to the Class members with unquestionably still

19   viable claims.  Moreover, the Plan of Allocation, pursuant to which Class members who

20   filed valid claim forms will receive pro rata distributions, is reasonable, and the

21   anticipated recoveries are adequate given the totality of the circumstances.  The proposed

22

23

ORDER AND JUDGMENT - 13

1    settlement meets the "fair, reasonable, and adequate" requirement of Federal Rule of

2    Civil Procedure 23(e)(2).

3    **D.    Attorneys' Fees and Costs**

4        Having concluded that the proposed settlement is fair, reasonable, and adequate,

5    the Court now turns to the two pending motions for attorneys' fees and costs.

6        **1.    Glancy, Labaton, Rossi, and Block Firms**

7        The Glancy, Labaton, Rossi, and Block Firms seek $2.5 million in attorneys' fees,

8    which represents twenty-five percent (25%) of the gross settlement amount, as well as

9    $150,699.33 in costs.  *See* Pls.' Mot. (docket no. 131).  For support, they rely primarily

10   on a Ninth Circuit "benchmark" for common-fund cases.  *See In re Pac. Enters. Sec.*

11   *Litig.*, 47 F.3d 373, 379 (9th Cir. 1995) ("Twenty-five percent is the 'benchmark' that

12   district courts should award in common fund cases.  The district court may adjust the

13   benchmark when special circumstances indicate a higher or lower percentage would be

14   appropriate." (citation omitted)).  They purport to also provide lodestar calculations, but

15   they have offered only summary tables, and they have not submitted any billing records

16   to support their figures.  *See* Ex. A to Hoffman Decl. (docket no. 132-1 at 6); Ex. A to

17   Sadler Decl. (docket no. 132-2 at 6); Ex. A to Nivison Decl. (docket no. 132-3 at 6);

18   Ex. A to Walker Decl. (docket no. 132-4 at 6).

19       The Ninth Circuit has made clear that a district court has discretion to apply either

20   the lodestar method or the percentage-of-the-fund approach in calculating reasonable

21   attorneys' fees in a common-fund matter.  *See Pincay Invs. Co. v. Covad Commc'ns Grp.,*

22   *Inc.*, 90 F. App'x 510, 511 (9th Cir. 2004); *Fischel v. Equitable Life Assurance Soc'y of*

23

1    *U.S.*, 307 F.3d 997, 1006 (9th Cir. 2002).  The rigor of the Court's lodestar analysis does

2    not, however, change merely because the attorneys' fees are sought on a common-fund

3    theory rather than pursuant to a contractual or statutory fee-shifting provision.  The one-

4    page spreadsheets listing various timekeepers, their positions, total hours, hourly rates,

5    and lodestar amounts that the Glancy, Labaton, Rossi, and Block Firms have submitted

6    are wholly inadequate.  They provide no information from which the Court can ascertain

7    what recorded hours were for legal services, as opposed to administrative matters, were

8    devoted to claims or arguments on which plaintiffs prevailed, and were reasonable under

9    the circumstances.  The Court concludes that further consideration of the lodestar values

10   offered by the Glancy, Labaton, Rossi, and Block Firms would not be helpful to the

11   Court's analysis regarding attorneys' fees.

12        As a result, the Court will concentrate on whether grounds exist for departing from

13   the twenty-five percent (25%) benchmark.  Through this lens, the Court is persuaded that

14   a reduction to twenty percent (20%) of the common fund is warranted.  *See Goldberger v.*

15   *Integrated Res., Inc.*, 209 F.3d 43, 50–53 (2d Cir. 2000) (holding that "both the lodestar

16   and the percentage of the fund methods are available to district judges in calculating

17   attorneys' fees in common fund cases" and concluding that the district court did not

18   abuse its discretion "merely because the fee awarded is at odds with the 25%

19   'benchmark' embraced by counsel" or "because [the 4% awarded] deviates materially

20   from the 11% to 19% usually awarded in similar cases").  This discount reflects Class

21   Counsel's overall lack of success in this litigation.  Of the eleven (11) challenged

22   statements, only one (1) survived; of the five (5) claims pleaded in the CAC, under two

23

1    (2) different statutes, three (3) claims were dismissed, leaving only one (1) statute still at

2    issue; and, of the ten (10) defendants sued in this litigation, only two (2) remained after

3    the Court ruled on defendants' motion to dismiss.  *See* Order (docket no. 89).  In their

4    motion for attorneys' fees, the Glancy, Labaton, Rossi, and Block Firms list a number of

5    activities to which they devoted time over the past three years, but many of these efforts,

6    including the drafting of initial and amended pleadings and responding to the previously

7    mentioned motion to dismiss, were in large part unsuccessful.

8            The downward departure is also supported by Class Counsel's performance

9    deficiencies in negotiating and presenting to the Court a non-viable proposal for the

10   settlement of this class action.  In addition to the obvious atypicality (conflict of interest)

11   and inequitable treatment (apportionment) problems that precluded the Court from

12   preliminarily approving the initially proposed settlement, Class Counsel failed to identify

13   certain IPO/SPO traceability issues and to provide enough information about anticipated

14   recoveries to permit the Court to assess the fairness, reasonableness, and adequacy of the

15   proposed settlement.  *See* Order at 5–13 (docket no. 123).  Moreover, Class Counsel

16   submitted user-unfriendly and error-filled proposed notices and forms, which could have

17   discouraged putative Class members from participating in the settlement.  *See* Order at

18   14–18 (docket no. 128); Minute Order at ¶ 1(a) & Ex. B (docket nos. 130 & 130-2).  In

19   sum, Class Counsel has, at times, presented work product that was not designed to

20   withstand judicial scrutiny.

21   / / /

22   / / /

23

ORDER AND JUDGMENT - 16

The Court is nevertheless persuaded that Class Counsel, along with liaison counsel, deserve a substantial amount of attorneys' fees for having achieved a favorable outcome for the Class despite the significant risk of recovering nothing.[5]  An award of $2 million in attorneys' fees, to be shared among the Glancy, Labaton, Rossi, and Block Firms,[6] is reasonable and consistent with the facts and procedural posture of this case and with Ninth Circuit jurisprudence concerning awards in common-fund cases.  The litigation costs for which the Glancy, Labaton, and Rossi Firms seek reimbursement are also reasonable.

---

[5] As acknowledged by the Glancy, Labaton, and Rossi Firms in their motion for attorneys' fees and costs, plaintiffs would have faced considerable challenges in establishing both liability and damages with respect to the remaining Securities Act claims, which were premised on the theory that "the failure to disclose Kawas's mistakes as a graduate student, while touting the exclusivity of a license for patents founded on Kawas's doctoral work, might have 'misled a reasonable investor about the nature of his or her investment.'" *See* Minute Order at ¶ 1 (docket no. 95) (quoting Order at 43 (docket no. 89)).  Among the evidence unfavorable to plaintiffs' position was the vehemently and publicly stated view of Kawas's dissertation advisor, Joseph Harding, Ph.D., Professor Emeritus at Washington State University, that Kawas's embellishments of certain blot pictures did not alter the underlying quantitative data and were "completely immaterial to the conclusions of any of the papers."  Harding Testimonial, Ex. 11 to Hoffman and Sadler Decl. (docket no. 132-11 at 6).  Harding has characterized the blot controversy as having made "a mountain out of a molehill," and he has expressed unequivocal support for Kawas.  *See* *id.* (docket no. 132-11 at 9).

[6] The Glancy, Labaton, Rossi, and Block Firms have agreed to apportion (i) ten percent (10%) of the total fee award to the Rossi Firm, (ii) a lodestar-based amount to the Block Firm, and (iii) the balance to the Glancy and Labaton Firms, to be split evenly.  *See* Mot. at 1 n.2 (docket no. 131).  Counsel have asked the Court to establish a lodestar "multiplier" that would be used to adjust the Block Firm's lodestar figure, namely $30,838.50, *see* Ex. A to Walker Decl. (docket no. 132-4), and to compute its share of the fee award.  The Court DECLINES to calculate any "multiplier."  Instead, based on the summary of services provided by the Block Firm, *see* Walker Decl. at ¶ 2 (docket no. 132-4), the Court concludes that a reasonable amount of attorney's fees is $24,000, which includes the attendance of two lawyers during the one-day mediation in November 2023, at rates of $900 and $595 per hour, respectively, or roughly $12,000, and an equivalent amount in fees for preparation.

ORDER AND JUDGMENT - 17

1    From the gross settlement fund, the following amounts shall be paid:

| Firm | Attorneys' Fees | Costs |
|---|---|---|
| Block & Leviton LLP | $24,000 | N/A |
| Glancy Prongay & Murray LLP | $888,000 | $87,381.23 |
| Labaton Keller Sucharow LLP[7] | $888,000 | $61,890.10[8] |
| Rossi Vucinovich, P.C. | $200,000 | $ 1,428.00 |
| **TOTAL** | **$2,000,000** | **$150,699.33** |

2.    **Slynes' Counsel**

The Slynes' lawyers, the firms of Keller Rohrback L.L.P. (the "Keller Firm") and Longman Law, P.C. (the "Longman Firm"), request $61,820 in attorneys' fees and $461.15 in costs. *See* Slynes' Mot. (docket no. 133). Although other individuals also unsuccessfully sought appointment as lead plaintiff, *see* Order (docket no. 60), their counsel have not brought similar motions for attorneys' fees and costs. The Keller and Longman Firms have not made clear whether the award they seek would be drawn from the gross settlement fund, thereby reducing the amount available to the Class, or from the fees granted to the Glancy, Labaton, Rossi, and Block Firms. Moreover, in asking for

---

[7] The Labaton Firm has agreed to pay thirteen percent (13%) of its attorneys' fees to The Schall Law Firm, which has never appeared in this action, but which is included in the Settlement Agreement's definition of "Plaintiffs' Counsel." *See* Mot. at 1 n.2 (docket no. 131); *see also* Order at 10 (docket no. 128) (citing Settlement Agreement at ¶ 1(ii) (docket no. 125-2)).

[8] This sum includes $3,400 for two attorneys to travel to attend the Final Approval Hearing. *See* Ex. B to Hoffman Decl. (docket no. 132-1 at 8). If less than $3,400 in costs is actually incurred, the difference shall remain part of the settlement fund.

ORDER AND JUDGMENT - 18

attorneys' fees, the Keller and Longman Firms have not provided any billing statements or summaries via which the Court could determine whether the work for which they wish to be paid was for legal services that contributed to the creation of a common fund.[9]

Rather than offer the detailed spreadsheets necessary to calculate a lodestar figure, the Keller and Longman Firms contend that they should be compensated for filing a motion on which they did not prevail, as well as other briefing, because the Slynes, who had no Exchange Act claims, were "the only . . . movants that made a motion . . . for the appointment of a separate lead plaintiff for claims brought under the Securities Act of 1933." Slynes' Mot. at 2 (docket no. 133). They further assert that the Court "accepted the reasoning" in the Slynes' motion "to appoint a separate lead plaintiff for claims brought under the Securities Act of 1933." Id. at 3. Contrary to the Keller and Longman Firms' suggestion, the Court did not appoint a "separate" lead plaintiff for Securities Act claims. Instead, the Court appointed co-lead plaintiffs, one of whom had only Exchange Act claims, and the other of whom (Rafi) had both Exchange Act and Securities Act claims. See Order at 5–9 (docket no. 60). In doing so, the Court explicitly rejected the

---

[9] The Keller Firm reportedly staffed the matter with two attorneys and two paralegals who collectively devoted 26.1 hours. See Farris Decl. at Ex. A (docket no. 133-2). The Longman Firm has indicated that Howard T. Longman, an attorney with a billing rate of $950 per hour, spent 32.6 hours, while Adam Longman, a paralegal with a billing rate of $325 per hour, spent 55.9 hours. See Longman Decl. at Ex. A (docket no. 133-1). The "principal tasks" undertaken by both the Keller and Longman Firms consisted of researching and drafting memoranda relating to the appointment of a lead plaintiff. Id. at ¶ 3; see Farris Decl. at ¶ 3. These "principal tasks" were presumably performed by lawyers, not paralegals, and no explanation has been provided regarding how the activities of paralegals constituted legal services or contributed to the creation of a common fund. For this reason, the motion is DENIED with regard to the paralegal fees at issue, namely $3,043.50 for the Keller Firm, and $18,167.50 for the Longman Firm.

1    Slynes' argument that Rafi would be less motivated than them to fairly and adequately

2    represent individuals and entities with solely Securities Act claims. *Id.* at 8–9. And, in

3    analyzing whether to appoint co-lead plaintiffs, rather than only one lead plaintiff, the

4    Court cited decisions of the Ninth Circuit and four district courts that did not even appear

5    in the Slynes' motion; two of the district court rulings were mentioned only in footnotes

6    in the Slynes' response or reply briefs, whereas another of these district court orders was

7    actually referenced by Rafi in the text of his motion for appointment as lead plaintiff.

8    *Compare id.* at 7-8 *with* Slynes' Mot., Resp. & Reply (docket nos. 32, 48, & 58) *and*

9    Rafi's Mot. (docket no. 42). Thus, the Court does not accept the Keller and Longman

10   Firms' theory that they played some pivotal role in the appointment of co-lead plaintiffs,

11   which is not in any way a novel approach, or that their unsuccessful bid to have their

12   clients appointed as lead plaintiffs with respect to solely Securities Act claims contributed

13   in a material way to the creation of the common fund. The Keller and Longman Firms'

14   motion is DENIED.

15   **Conclusion**

16        For the foregoing reasons, the Court ORDERS:

17        (1)    The Court has federal-question jurisdiction pursuant to 28 U.S.C. § 1331.

18        (2)    Plaintiffs' unopposed motion for final approval of the proposed settlement,

19   docket no. 134, is GRANTED.

20        (3)    The Court CONCLUDES that the best notice "practicable under the

21   circumstances" was provided to members of the Class, and that the "opt in" approach

22

23

1  used in this matter comported with the requirements of due process and Federal Rule of

2  Civil Procedure 23.

3      (4)    The Court APPROVES the Amended Stipulation and Agreement of

4  Settlement, Ex. 1 to Hoffman Decl. (docket no. 125-2), FINDS in accordance with

5  Federal Rule of Civil Procedure 23(e)(2) that the Settlement Agreement memorializes a

6  fair, reasonable, and adequate settlement, and DIRECTS that the Settlement Agreement

7  be consummated pursuant to its terms and conditions.

8      (5)    The Minute Orders entered August 9, 2021, October 28, 2021, August 24,

9  2022, October 4, 2022, May 31, 2023, March 29, 2024, and September 30, 2024, docket

10  nos. 15, 62, 91, 95, 119, 130, and 136, and the Orders entered October 5, 2021, July 29,

11  2022, February 17, 2023, September 27, 2023, and February 15, 2024, docket nos. 60, 89,

12  114, 123, and 128, are INCORPORATED herein by reference.

13      (6)    The Plan of Allocation as explained in the Order entered February 15,

14  2024, docket no. 128, summarized in this Order, and described in the long-form notice to

15  the Class, _see_ Ex. A to Evans Decl. (docket no. 134-2), is APPROVED.

16      (7)    The Public Justice Foundation is DESIGNATED as the _cy pres_ recipient.

17      (8)    The claims of each member of the Class that were or could have been

18  asserted in this action are hereby DISMISSED with prejudice, and the release of claims

19  set forth in the Settlement Agreement shall have binding effect, provided, however, that

20  all persons who have opted out of the Class, as indicated in Exhibit D to the Declaration

21  of Sarah Evans, docket no. 135, are not bound by this dismissal or the terms of the

22

23

ORDER AND JUDGMENT - 21

Settlement Agreement.  Any person who has opted out of the Class shall not receive any of the proceeds from the settlement.

(9)    Plaintiffs' motion for attorneys' fees, costs, and a service award, docket no. 131, is GRANTED in part and DENIED in part.  The Glancy, Labaton, Rossi, and Block Firms are collectively AWARDED $2,000,000 in attorneys' fees and $150,699.33 in costs, to be paid from the gross settlement fund, and to be apportioned as set forth in the table on Page 18.  The Court CONCLUDES that the awarded attorneys' fees and costs are fair and reasonable in light of the work performed, the results achieved, and the nature and procedural posture of the claims asserted.

(10)    For their service, Class Representatives Antonio Bachaalani Nacif and Wies Rafi are each AWARDED $5,000, and Class Representative Hang Gao is AWARDED $1,000, to be paid from the gross settlement fund.

(11)    The Slynes' motion for attorneys' fees and costs, docket no. 133, is DENIED.

(12)    The Settlement Administrator is AWARDED up to $170,000 for fees and costs already incurred and anticipated to be incurred to complete the administration of the settlement.  This amount shall be paid from the gross settlement fund.  The Settlement Administrator is authorized to pay taxes and escrow fees from the gross settlement fund.

(13)    Judgment is hereby ENTERED for purposes of Federal Rules of Civil Procedure 58 and 79, and the time period for filing any notice of appeal shall commence on the date of entry of this Order and Judgment.  Without affecting the finality of this Order and Judgment, the Court retains continuing and exclusive jurisdiction over the

1  interpretation, consummation, and enforcement of the Settlement Agreement and the

2  distribution of payments required therein.

3      (14)    The Clerk is DIRECTED to send a copy of this Order and Judgment to all

4  counsel of record and to CLOSE this case.

5      IT IS SO ORDERED.

6      Dated this 1st day of November, 2024.

7

8

9      Thomas S. Zilly
       United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

ORDER AND JUDGMENT - 23