UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

_____

|                          | )  |                         |
| Nacif, et al.,           | )  | CASE NO. C21-0861-TSZ   |
|                          | )  |                         |
|            Plaintiffs,   | )  | Seattle, Washington     |
|                          | )  |                         |
| v.                       | )  | October 25, 2024        |
|                          | )  | 10:06 a.m.              |
| Athira Pharma, et al.,   | )  |                         |
|                          | )  | Final Approval Hearing  |
|            Defendants.    | )  |                         |
|                          | )  |                         |

_____

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE THOMAS S. ZILLY
UNITED STATES DISTRICT JUDGE

_____

**APPEARANCES:**

  For the Plaintiffs:        THOMAS G. HOFFMAN, JR.
                             Labaton Keller Sucharow LLP
                             140 Broadway
                             New York, NY 10005

                             CASEY SADLER
                             JOSEPH D. COHEN
                             Glancy Prongay & Murray LLP
                             1925 Century Park East, Suite 2100
                             Los Angeles, CA 90067

                             JULI E. FARRIS
                             Keller Rohrback LLP
                             1201 3rd Avenue, Suite 3400
                             Seattle, WA 98101-3052

                             MICHAEL D. GAINES
                             Block & Leviton LLP
                             260 Franklin Street, Suite 1860
                             Boston, MA 02110

                             BENJAMIN T.G. NIVISON
                             Rossi Vucinovich PC
                             1000 Second Avenue, Suite 1420
                             Seattle, WA 98104

For the Defendants:      GREGORY LEWIS WATTS
                         Wilson Sonsini Goodrich & Rosati
                         701 Fifth Avenue, Suite 5100
                         Seattle, WA 98104

                         SEAN C. KNOWLES
                         Perkins Coie
                         1201 3rd Avenue, Suite 4900
                         Seattle, WA 98101-3099

                         JOHN J. CLARKE, JR.
                         DLA Piper US LLP
                         1251 Avenue of the Americas
                         27th Floor
                         New York, NY 10020

Reported by:             MARCI E.C. CHATELAIN, CCR, RMR, CRR
                         Federal Court Reporter
                         700 Stewart Street, Suite 17205
                         Seattle, WA 98101
                         marci_chatelain@wawd.uscourts.gov

PROCEEDINGS

---

THE CLERK:  All rise.

The United States District Court for the Western District of Washington is now in session, the Honorable Thomas S. Zilly presiding.

THE COURT:  Good morning, ladies and gentlemen. Please be seated.

THE CLERK:  We're here on the matter of Nacif, et al., versus Athira Pharma, Inc., et al., case number C21-0861, assigned to this Court.

Counsel, will you please make appearances for the record?

MR. HOFFMAN:  May it please the Court.  Good morning, Your Honor.

Tom Hoffman on behalf of the Labaton Keller Sucharow firm for plaintiffs and the Class.

I'm joined by my co-lead counsel, and at Your Honor's request, Mr. Paul Mulholland, from the claims administration firm SCS.

THE COURT:  All right.  And do you want to identify the other lawyers that are at counsel table?

MR. HOFFMAN:  The other lawyers at counsel table are Casey Sadler from the Glancy firm; his colleague, Joe Cohen from the Glancy firm; and, I'm sorry, I believe you're from Keller Rohrback, but I didn't catch the name.

MS. FARRIS:  That's okay.  Sure.

Your Honor, Juli Farris from Keller Rohrback on behalf of the Slynes, plaintiffs, and Howard Longman at Longman Law.  We filed a motion as contributing counsel.

THE COURT:  All right.  Thank you.

Let's have appearances for the record from counsel sitting at counsel table for the defense.

MR. WATTS:  Thank you, Your Honor.

Good morning.

Gregory Watts of Wilson Sonsini for all defendants, other than Dr. Leen Kawas.

MR. KNOWLES:  Good morning, Your Honor.

Sean Knowles from Perkins Coie on behalf of defendant Leen Kawas.

THE COURT:  All right.  Good morning.

MR. CLARKE:  Your Honor, on Zoom, this is John Clarke from DLA Piper here on behalf of the underwriter defendants.

THE COURT:  All right.  Good morning.

MR. CLARKE:  Good morning.

THE COURT:  Anyone else on Zoom that wishes to make an appearance?

Is there anyone in the courtroom who is a Class member or someone who needs to make an appearance or identify themselves?

MR. GAINES:  Sorry, Your Honor, I should also make an appearance.

My name is Michael Gaines.  I'm counsel for additional plaintiff, Hang Gao.

I don't believe that you will need to hear from me, but I'm here just in case.

THE COURT:  All right.

All right.  Thank you.

And good morning, again.

We have on Zoom other individuals whose cameras are not on, apparently.  And if they need to be heard at some point, they should alert the clerk and we'll address it at that point.

This matter comes before the Court for various motions:

Plaintiffs' motion, Docket 134, for final approval of Class settlement; a motion for attorneys' fees and litigation costs brought by Class counsel, Docket 131; and motion for attorneys' fees and litigation costs, Docket 133, brought by the movant Timothy Slyne, S-l-y-n-e, and Tai Slyne, the firms of Keller Rohrback and Longman Law.

The Court, in preparing for this hearing -- you can sit down for a moment, Counsel, I want to make a record of where we are and what we are --

MR. HOFFMAN:  Thank you, Your Honor.

THE COURT:  The date and time for this hearing was announced in the Class notice that was sent out.  And it was on the website maintained by the settlement administrator, at least from October 15th to October 25th, more than 10 days -- or

approximately 10 days before this hearing.

And for the record, again, nobody in the courtroom appears, other than counsel, so there is no Class member appearing by being here present.

And I'm not sure that there's anyone appearing via the Zoom this morning who is a person who is a Class member. So let me just ask because I'm -- there are approximately half a dozen people on the Zoom; is anyone on the Zoom a Class member wishing to be heard?

All right. For the record, I can say that there are no Class members that have appeared today in court or by Zoom or have called in, in any way, and we can proceed, I believe, with respect to the issues that we have before us.

Now, in connection with preparing for this hearing, the lawyers know that the Court has been, I'm going to say, drilling down in terms of the numbers that have been provided to me because there were some, in our minds, serious questions.

The numbers seemed to be moving somewhat, more than just a minimal movement, so that we reached out just this week by e-mail on the 24th and sent an informal e-mail to Class counsel asking for information and clarification. And I want to go through that -- the questions I raised and the responses I received.

I am going to order that the questions I sent to counsel and the responses that we received by e-mail be filed in the

court record so that it's a public record, but I want to also be sure that both the case administrator and counsel can verify for us today the information we received informally in the manner of the e-mails because, obviously, that was very informal, but I felt that rather than try and sort it out this morning without giving you an opportunity to look at your records, we may not have had the same full explanation that you have provided and which, generally, I think satisfies the Court with respect to the issues we raise.

So let me just walk through briefly those issues that we raised.

First question that we asked was, When the motion for preliminary approval was brought, the Class was estimated to include "approximately 30,000" members and "likely more than 45,000."  That was provided to us.  See our order, Docket 128.

So we asked, Does the number of notices distributed, 25,632, reflect a more accurate tally?

The answer we got, and I'm going to paraphrase here, I'm not going to read the whole answer, but it will be part of the public record, is that the information is scattered between the transfer agent's records and the nominees, but the current mail count of 25,632 is likely a more accurate number of Class members; however, this is not a definitive number because it's impossible to track whether brokers and institutions with Class member information failed to respond.

Is that response -- can counsel represent to the Court that based on all the information you and the case administrator have that that's an accurate response to the question?

MR. HOFFMAN: Yes, Your Honor. I affirm that that is an accurate response to the question.

The previous estimate was just that, it was an estimate. These are -- the 25,632 number is the up-to-the-minute, as of when we created this document, actual count.

THE COURT: All right. I think it is important to have a best estimate of the number. And I'm satisfied that all efforts have been made and that's as far as we can go.

The second question that we asked was, The number of undeliverable notices appeared to be 532, which reflects a 2 percent failure rate. How does the rate compare with other similar cases or matters?

And the answer we received is that the 2 percent is not unusual based on other security cases that Counsel has -- or the administrator has administered. And in most -- and in several cases, the ultimate failure rate was greater than 2 percent.

And you've cited some cases. They'll be part of the public record.

But, again, can counsel represent to the Court that this information comes from the administrator and is the best accurate information?

MR. HOFFMAN: Yes, Your Honor. I can so represent

this information did, in fact, come from the claims administrator. The 2 percent failure rate for the notice packets mailed for the case is not unusual. Indeed, it is, in fact, very good.

THE COURT: All right. The Question No. 3 -- thank you, Counsel -- Question No. 3, was, Of the 8,293 claims forms submitted, 6,077 have been provisionally deemed ineligible.

That seemed, to me, without understanding all of the requirements, to be very high. And so I was concerned and asked, Does the settlement administrator agree that the balance of the claim forms have been provisionally deemed valid? And does this figure which are deemed valid, are they accurate?

And the answer we received -- and just for the record, there were over 6,000 claim forms that were filled out. This was a very complicated claim form. And someone who took the time to address it and fill it out, to reject 6,000 of the 8,200-plus seemed like a great number and I was concerned.

One of the reasons I asked the settlement administrator to be present today, after I did that, and I'm happy you're here and you perhaps can verify as well, but we've reached out and gotten more information. The information that we got to the question, The amount of provisionally deemed valid claims decreased because some of the claims have been identified as claiming shares purchased outside the Class period. But, basically, only approximately 2,227 claims have been

provisionally deemed valid.

Let me ask the administrator first, again -- appreciate you being here.  Mr. Mulholland, is it?

MR. MULHOLLAND:  Yes, Your Honor.

THE COURT:  Are those numbers accurate?

MR. MULHOLLAND:  Yes, Your Honor, they are.

THE COURT:  And as I understand it, of the 6,077 approximately that you deemed not eligible, you've given reasons.  And I just want to run through the reasons because they seemed reasonable, but it also seemed like a great number of people who have made claims are being rejected by the administrator and by me, ultimately, if I approve these numbers.  But of the 6,077, 3,418 were shares not purchased during the Class period.  And those are the numbers that you've come up with?

(Off the record.)

THE COURT:  All right.  My law clerk is indicating that yesterday's numbers changed a little bit, so let me give you yesterday's numbers.

Thank you.

The 3,424 were not purchased during the Class period, and that -- I'm sorry, 2,799 were purchased and sold before June 18, 2021.

Mr. Mulholland, is that -- are those the records that reflect your findings?

MR. MULHOLLAND:  Yes, Your Honor.

The 3,424 were primarily claims submitted where people purchased during the PSLRA 90-day lookback period, which is on the claim form, but it's after the corrective disclosure.

So, you know, what often happens is the information submitted will perhaps look at the claim form and look at the information where we do have to get trading data after the Class period so that we can factor in, you know, the 90-day lookback for the Exchange Act.

And then even for the Securities Act, you know, there's about a one-week period between the corrective disclosure and then the date of suit under Section 11, which is the Securities Act.  So -- yes, so because of that, there were quite a few submissions.

As far as the 2,799, some of those people may have lost money, but they did not hold through a corrective disclosure; and therefore, you know, there were 68 million shares that traded during the Class period, so the stock did turn over.  But because they did not hold through a corrective disclosure, they did not qualify as eligible shares.

THE COURT:  All right.  And the other reasons for -- are outlined in the answer.  I'm not going to go through them, they're relative small in number, but are those numbers accurate, to the best of your knowledge, sir?

MR. MULHOLLAND:  Yes, Your Honor, they are.  We have a

very robust quality assurance procedure.  And sometimes these claims are looked at three or four times before they -- you know, we put the final stamp on 'em as whether valid or invalid. So we're still working on that.  We're still doing some QA. It's -- as of now, though, it's -- we're real close; we're real close.

THE COURT:  My related question was the ratio of submitted forms to those that were rejected reflect a 32 percent response rate; is that reasonable?

MR. MULHOLLAND:  Yes, Your Honor, because two -- there's two major reasons.  One is there was only one corrective disclosure versus multiple corrective disclosures, so -- and, also, because of the length of the Class period between those two reasons, it creates -- you know, the length of the Class period creates the ins and outs that don't hold through a corrective disclosure.  And then -- you know, that's -- that's the primary reason.

In this case, too, there were -- what may have happened is there were quite a few shares that traded the next day after the Class period, but was within a 90-day lookback.  And claims were submitted thinking perhaps that, you know, January 18th they would be part of the Class, but they're not.

THE COURT:  And your submission or the submission we received informally, which we're going to file, that I referred to, reflects that your company as an administrator has

administered many cases with a ratio of less than 32 percent; is that correct?

MR. MULHOLLAND:  Yes, Your Honor.

THE COURT:  All right.  And you've cited some cases; I'm not going to cite them, they'll be filed with the record.

And Question 5 was, The initial declaration indicated that the claim forms provisionally deemed valid were 2,702, associated with approximately 19,464,956.  That number has apparently decreased to 2,216, and we asked why.

And the answer we received was that the current balance of valid damaged shares, which are shares that would be entitled to participate in the Class settlement, decreased when the out-of-Class period shares increased as we discussed previously with respect to Question 3.  The current balance of valid damaged shares is 14,000, let me get my glasses here, 14,430,7- -- 14,430,720 damaged shares.

Is that the best number we have?

MR. MULHOLLAND:  Yes, Your Honor.

THE COURT:  And with respect to Question 6, it also relates to this, we asked about the valid damaged shares in connection with the Securities Act claim.

And the answer we received was, Currently, there are 8,537,6405 [sic] valid damaged shares in connection with the Securities Act claim as a result of changes from Class membership, quality assurance reviews.  This is 32.8 percent

less than the damaged shares estimated by Dr. Nye; however, the claims process is ongoing, the figure is subject to change.

Is that your answer to my question?

MR. MULHOLLAND: Yes, Your Honor.

THE COURT: And I'm always bothered by an answer that says the process is ongoing and it's subject to change. I mean, are we essentially drilling down to the -- how confident are you of these numbers?

MR. MULHOLLAND: Your Honor, I'm very confident that we're close. I can't give you an exact percentage, but it's very close because we are more than halfway through our quality assurance.

We do have a curing process, so we're going to try to get some of these deficient claimants to correct their claim forms; that's going to add more.

And then when we send out rejection notices, the large majority of the rejection notices, which we haven't sent out yet, will sometimes bring a few Class members back in questioning our rejection notice, so that could increase it a little bit. I know we've had an increase of about nine claimants -- or valid claimants just like in the last couple weeks. So chances are we're real close. Can't give you an exact percentage, but I would say it's not going to deviate far from this number right now. It may even go up a little bit.

THE COURT: All right. And let me ask counsel whether

he has done his due diligence and confirm the representations the administrator has made to the Court this morning.

MR. HOFFMAN:  Yes, we have, Your Honor.

THE COURT:  All right.

MR. HOFFMAN:  And it is still a bit of a moving target for a couple of reasons.  As Mr. Mulholland stated, they're working with Class members to do whatever they can to get valid claims corrected and processed.

There's also, we know, multiple layers of the QA or quality assurance process that Mr. Mulholland's firm undertakes, and that can lower the number of valid claims.

So it is a bit of a moving target.  It's an iterative process, but we're almost there.

THE COURT:  All right.  Thank you.

I think, basically, what you've provided, and I appreciate your being here because I think -- and giving us the updated numbers.

We're at a point where I can make findings that the Class notice was given, that the process of going through the claims was vigorous.  And although the numbers may change slightly, that they are at a best point time to say that there's been adequate fair notice given to the Class, that these are the numbers of people who have filed claims that would be approved, and that everything possible has been done.

And of course, let me ask this, has anyone filed an

objection to the proposed settlement?

MR. HOFFMAN:  No, Your Honor.

Not to bury the lead, but there are no objections to the $10 million settlement, no objections to the plan of allocation, and no objections to the request for attorneys' fees, and nobody has appeared today.  And so this is a rare circumstance where there are no --

THE COURT:  Well --

All right.  And of course, because of the nature of the case, the defendants have put their money in the bank, if you will, and are not taking part in contesting or challenging any part of what's being asked here.

So let me go -- as the lawyers know and for the record, this has had a little bit of a tortured history in my opinion because back as early as April of '23, 2023, plaintiffs filed their first motion for preliminary approval.  And that motion was then deferred while I asked for further information.

And ultimately, I denied it by order dated September 27. There were numerous reasons why the first proposed settlement was inadequate.  I've spelled that out in my order, Docket No. 123.

So it was not until later in December of 2023 when this motion was brought, and I treated it as a renewed motion.  And that brings us to today and the issues before the Court.

Let me -- there are -- in giving you my agenda for today,

there are issues that I am going to want to hear argument on, but let me ask about ones that perhaps there is no dispute about.

As I understand it, the money has been earning interest, and as of today, the $10 million has earned approximately 185,000 in interest income.

The service award is something that I'm going to approve. And I need no -- they're modest amounts, which are appropriate under the circumstances.

Let me ask about the settlement administration costs. There was a previous estimate at 200,000. As I understand it as of -- approximately now, the cost is approximately 170,000.

Does the administrator anticipate additional costs? Can we cap it at a 170-? Can we say that -- what I'm inclined to do, let me tell you, is to -- because you are going to have some additional costs, obviously, is to say that it's capped at 200,000. If you don't spend it, then it will go into the pot, if you will, for the claimants.

Is that fair? Are you comfortable with that, sir?

MR. MULHOLLAND: Yes, Your Honor.

THE COURT: Are we at about 170,000 now?

MR. MULHOLLAND: Yes, Your Honor.

THE COURT: And what do you estimate --

MR. MULHOLLAND: I -- we would cap it at -- we can cap it at 170-, Your Honor.

THE COURT:  You can cap it at 170-, you're okay with that?

MR. MULHOLLAND:  Yes, Your Honor.

THE COURT:  All right.  I'll do that.

Obviously, there will be taxes, income taxes, on the amount that has earned interest, and parties estimate that might be as much as 77,000, but it's all plus, if you will, because the money's been sitting there.  And there's escrow fees of 10,400.

So I think that what we have, and perhaps it would be helpful if counsel would now give a general recap of the litigation, what was at issue, and how we arrived at the $10,000 [sic] settlement, so that I can make findings with respect to whether the settlement is reasonable under all the circumstances.

Obviously, I have made a preliminary -- a previous order in the spring that indicated that based on what I knew about the case that the settlement was reasonable, but let's have an overview of the case.

MR. HOFFMAN:  Sure.

Thank you, Your Honor.

So the issue for today is whether the settlement is both substantive --

THE CLERK:  Counsel, can you go to the podium?

MR. HOFFMAN:  Oh, excuse me.

Thank you.

By the way, I have to point out that Your Honor misspoke, it's actually a $10 million settlement.

THE COURT:  What did I say?

MR. HOFFMAN:  You said $10,000.  $10,000 wouldn't -- we don't believe --

THE COURT:  Thank you.

MR. HOFFMAN:  -- would be fair.

THE COURT:  Well, we wouldn't be here, would we, for $10,000.

MR. HOFFMAN:  Exactly.

So the issues for today are whether the $10 million settlement is both substantively and procedurally fair.

I'm happy to report that, in part, because of the interest environment that Your Honor was alluding to, the actual payout as a Class member is -- for the Securities Act claims is 12.7 percent of the maximum potential damages for those claims. For the Exchange Act claims, which the Court dismissed, the payout is 1.5 percent for those claims.

Even if you blend them together, that is a rate of 7.7 percent of, again, the maximum potential damages in the case, which is nearly double the high end of the median recovery in similar securities cases in the past 10 years, which is 3.8 percent.

We're also happy to report that claimants representing about 70 percent of the damaged shares have submitted claims,

which is a very good, very high rate.  And we believe that this is a particularly good result, considering the context.  And Your Honor is asking for context.

You will recall that by the time the action had already settled, the Court had already dismissed most of the defendants from the case, and had dismissed the securities fraud claims. The only fraud claims were against the former CFO in the company, and they were based only on one alleged misstatement that was repeated in both the IPO and SPO prospectuses.  So plaintiffs would have faced numerous hurdles in proving liability and damages in this case, any one of which could have resulted in a recovery much smaller than the settlement amount or, in fact, no recovery at all, because a very important fact, as it stands today, is that Athira's ability to pay a judgment or a settlement greater than the settlement amount of $10 million has significantly diminished since the parties reached the settlement.

We -- because at the time of the mediation, we knew that the company was in trouble, the corrective disclosures in this case had to do with the initial failures of the company's most important drug candidate in the clinical trials.  So under those circumstances, we knew that the company could be in trouble. And in fact, subsequent events have borne that out.

THE COURT:  It would be fair to say that those events and -- are unrelated to what we're dealing with in this case; is

that fair?  In other words, their -- the failure of the tests obviously affected the market and the value of the company, unrelated to this lawsuit and the claims here; is that fair?

MR. HOFFMAN:  I'm in settlement mode, Your Honor, so I'm going to try not to litigate that.

I would certainly be standing before Your Honor arguing that they were related if we were in litigation mode.

I think that's as much as I can say without causing my coll- -- my friend Greg here to stand up and give a speech.

THE COURT:  That's fair.

MR. HOFFMAN:  So it's not complete -- I think the most we can say, we would have argued that it is not completely unrelated.

Well, I won't go into the allegations and start litigating the merits --

THE COURT:  No.

MR. HOFFMAN:  -- but Your Honor understands.

So substantively, particularly in light of subsequent events, which are at least partially related, we believe that the settlement is procedurally -- or, excuse me, substantively fair.  And we could not get a better deal for Class members today, even if we had continued to litigate, you know, for many, many more months.

Procedurally, the settlement is the result of an arm's-length negotiation, as Your Honor alluded to.  We actually

had two mediations in this case. We had the initial mediation to come up with the settlement amount.

And then based on Your Honor's questions and issues with the initial plan of allocation between the Securities Act and the Exchange Act Classes here, we went back for a second day of mediation, second mediation date, brought on the named Plaintiff Gao, who participated through counsel in that process. And that's when we came up with the allocation between Securities Act and Exchange Act.

As I previously mentioned, the recovery for the Securities Act is now significantly higher, 12.7 percent; the recovery for the Exchange Act, 1.5 percent. And that is the direct result of Your Honor's pressing us on that issue.

THE COURT: When you say "pressing," I was quite disappointed in your firm's failure to identify what I felt was a total conflict between the clients you were representing and the effort, because you made that motion, the initial motion, as I said, in the spring of 2023. If you had identified that conflict and the other issues, we'd have been -- this case would have been long over.

In any event, it seemed to me quite clear that the exchange claimants had little to talk about given the Court's prior rulings and that they could not be treated the same. And obviously, the mediator and you have now agreed that the exchange claimants' percentage of recovery is much smaller.

And I guess that's where we are.

MR. HOFFMAN:  I understand Your Honor's concerns.

Just to be clear, I'm from the Labaton firm.  We represented Mr. Nacif, who was the representative for the Exchange Act claims.  And we did have an adversarial process in both mediations.  And in both mediations, it was the mediator that actually made a mediator's recommendation in the case the second time around, and adding in -- so, in other words, what Your Honor is saying is that I actually did too good a job for the Exchange Act Class the first time around, so, thank you, Your Honor, I appreciate that.

THE COURT:  Well, yes; that's fair.

MR. HOFFMAN:  What we were really doing, you know, not to criticize our co-counsel, what we really did was we went with the precedent cases and the splits in those cases.  You know, that's no secret Your Honor took a dim view of the Exchange Act claims in this case and thought they were worth relatively less, even more less.  The Securities Act claims were getting a bump. They were getting more than the Exchange Act claims in our initial proposal.  But -- and we did, you know, what we had found people had done in precedent cases, which is what we had presented to the mediator.

And, you know, credit to Your Honor, the standard practice is not necessarily good enough for you under, you know, the circumstances presented here, I guess.  And we had a redo on

that one narrow issue, was just that allocation between the Exchange Act and the Settlement Act. I, the second time around, again put my best foot forward and argued for more for the Exchange Act.

Our co-counsel representing the Securities Act, you know, were rowing in the other direction when it came to that; but to be clear, in both mediations, we were rowing in different directions. We were -- that was what actually happened.

So -- but we are where we are, and -- and I think that's all I have to say on that issue, if Your Honor is satisfied.

THE COURT: All right. Thank you.

Are you finished?

MR. HOFFMAN: That's it on that issue.

I'm happy to answer any other questions that Your Honor might have about the --

THE COURT: I don't think I have any other questions. We haven't dealt with attorneys' fees, and we will to that, but let me make some final findings.

We'll obviously enter an order that will lay out in final order these things, but I think given the nature of the settlement, the amount of the settlement, the fact that there were adequate and rigorous notices given and no objections filed, I think I can conclude and will in the order provide that the Court has, obviously, federal question jurisdiction under the statute, that the unopposed motion for approval of the

proposed settlement amount is granted.  That the best -- I'm satisfied, and I can conclude that the best notice practicable under the circumstances was provided to the members of the Class, and that the opt-in approach used comported with the requirements of both due process and the Federal Rules of Civil Procedure.

The Court approves the amended stipulation and agreement of the settlement, which requires 10 million to have been deposited, plus interest.

The plan of allocation as explained in the order entered February 15th, Docket No. 128 is approved, finally.

The claims of the members that were or could have been asserted are dismissed with prejudice.

And the release of claims set forth in the settlement agreement shall be binding.

The settlement administrator is awarded fees in the amount of $170,000, which he has, on behalf of his firm, indicated is an acceptable amount.  And I believe those costs have been incurred or will be to complete the administration.  And ultimately, judgment will be entered.

I think that brings us to the question of what's the amount of the attorneys' fees.  And I am going to want to have some oral argument on it because I'm having some issues with respect to the claim of attorneys' fees in the amount that you have proposed, but I think, really, the only issue remaining is

attorneys' fees.

So why don't we take about a long five-minute recess, and then we'll come back, I'll hear the argument with respect to attorneys' fees.

And then I'm going to take the attorneys' fees issues under advisement. I'm not going to enter a ruling today, unless I change my mind after your wonderful arguments.

So we'll be in recess for approximately five to ten minutes.

MR. HOFFMAN: Thank you, Your Honor.

THE CLERK: All rise.

Court is in recess.

(Court recessed 10:48 a.m. to 10:57 a.m.)

THE CLERK: All rise.

Court is again in session.

THE COURT: Please be seated.

All right. Let's proceed.

We have the motion for attorneys' fees in the case.

And counsel was asking for $2.5 million in attorneys' fees, which represents 25 percent of the gross settlement amount, as well as 150,000 in costs. I don't think costs are anything I need to hear about and I'm going to approve those costs. I believe they're adequately identified, and so we're really talking about attorneys' fees.

MR. SADLER: Sure, Your Honor. And thank you very

much.

In terms of the fee request, per the notice, we had put that we would ask up to a third. And with the expenses, we said $235,000. And as the Court noted before, and as we discussed in terms of final approval, there's been no objections at all to the 33-1/3 number, let alone the 25 percent number that we actually ended up arguing. We would say that that augers -- that it's an excellent fee request and that it should be approved.

And 25 percent is also, you know, the benchmark in the Ninth Circuit. And the Courts are, you know, loath to deviate one direction or the other, unless there's outstanding reasons.

Another thing I'd point out is that while we are asking for a percentage, if you look at our Lodestar, we're asking for what's a negative multiplier, right, less than our --

THE COURT: Well, your Lodestar, you haven't given me really much information, have you? You gave me summary only of -- a one-page summary of what you say were the hours. I don't have any idea what work was done.

And if we consider the Lodestar, would I not have to take into account all of the claims that you made which you were not successful on? How do I know how much time you spent on the claims that you were successful on, which are only a few of the many claims that were brought?

MR. SADLER: Well, Your Honor, we would say -- well,

that is a very difficult thing to display, because, obviously, when we're briefing, for example, the motion to dismiss, right, we were briefing them both kind of simultaneously.  But I would go back to more of the -- this is a common fund case.  And I think the result is what we should look at.  We got $10 million for the Class.  And our effort was done to get that $10 million for the Class.

How we got there.  You know, we obviously would have loved to have more claims go through and would have had it be a little differently, but, you know, all the work we put in is what ultimately resulted in defendants agreeing to settle.

THE COURT:  What percentage of the work included work that was done for the unsuccessful claims, would you estimate?

MR. SADLER:  Oh, that, I don't know, but I think it is relatively minimal in the scheme of things, seeing as that --

THE COURT:  When you say "relatively minimal," what I would say is that the claims you were successful on were relatively minimal compared to the other -- all of the claims. I mean, you weren't -- you had a lot of claims that were unsuccessful.

MR. SADLER:  Sure.

THE COURT:  And most of the defendants were dismissed. And there was no motion.  And I -- in that motion to dismiss, I gave you leave to refile and that was not done.  So, obviously, you must have concluded that all of the claims that I

dismissed and all of the defendants that I dismissed were properly dismissed.

MR. SADLER:  Well, Your Honor, with the PSLRA cases and with the discovery stay, you know, the universe of information that we have is limited, right?  This isn't a non-PSLRA case where you have discovery, so you can go in and when you're amending say, hey, give us some documents and we can update the record.  In the PSLRA case, we had done what we thought was a sufficient job to get through on the Exchange Act claim, but the Court obviously disagreed.

But at that point, we were not in a position to get new information in the world that -- without -- absent discovery.  So we made a strategic decision to go forward on the claims and get discovery.  And if discovery had shown that we wanted -- we could bring 'em back in, we would have tried to do that.  You know, there is a what-can-we-do?  And the Court had already expressed its opinion very forcefully, so we didn't want to waste the Court's time, we figured we would go forward and litigate the case.  And if we could bring back those claims, that would be great.

You know, we thought like, for example, the underwriter should have stayed in the case.  And that's why we fought the Rule 54(b) motion that they -- that you had dismissed them, and they had sought judgment.  And we said, No, keep them in the case going forward, and you granted that.

THE COURT:  Well, the other thing that we -- that I alluded to, perhaps with the wrong lawyer standing at the podium, but I was very concerned and surprised that there wasn't more -- in the first motion for approval, which I declined to approve, there were -- my order outlined numerous things that we felt were wrong with the approach, but primarily it was the conflict that we identified between the Securities Act claims and the exchange claims, which really wasn't addressed by counsel until after our order and you went back to mediation. We should have been here at this hearing a year ago, but for the motion you brought originally, which had no traction whatsoever.

MR. SADLER:  Well, Your Honor, to address a couple things there:

There's kind of two separate issues; that is, there's, A, you said that there was a conflict between the peop- -- the claims that got dismissed and the claims that didn't get dismissed, right, so there -- that there was -- that applies to both the Securities Act plaintiff and the -- that's why we had to bring in Gao, and that's something that in other cases -- and not to say how we did it was wrong, but it's a -- that situation due to res judicata issues is not a situation we've ever had where you have certain dismissed claims, and then you settle on behalf of those claims, and that the Court found that there was a conflict between the people who got the claims dismissed and the people who hadn't yet.  You know, it's a Class action, so

the -- if you get dismissed as to one, presumably it gets dismissed against the rest of the Class.

But to get back to the -- how the allocation got split between the Securities Act and the Exchange Act; ultimately, where we got I think makes a lot of sense, but there were certain things that the Court decided in the interim that let us get there. For example, originally, before we had your rulings on tracing and allowing that there wasn't a tracing issue between -- you basically said, look, there was an IPO and an SPO, the State moves on both, so we don't have to distinguish if you trace from one to the other. And it made it really easy to make a plan of allocation for that, right, because it was like if you bought between A and B date, you have a Securities Act claim, and then if you bought afterwards, you have an Exchange Act claim.

Before those rulings, we couldn't make that distinguishing. It's very hard. That's why we originally had the SPO tracing, we had to put it if you bought at the date at the amount, right? And then it was -- you know, it was harder to trace the IPO. So that's why we did the plan of allocation the way we did, acknowledging that even though it looks like we were giving a bump of 25 percent to the Securities Act plaintiffs, if you had an Exchange Act claim, you also had a Securities Act claim, so there was kind of --

THE COURT: Well, there were many people that didn't

have both; isn't that right?

MR. SADLER:  It's true.  There is.  But it's a how --
it's kind of an imperfect situation where we couldn't trace, we
couldn't do this.  We did the best we could with what we had at
the time, which is relatively the standard practice in this kind
of thing.

And, you know, as we were talking about with the claims,
this is a situation where we don't have the full universe of
information, right?  We don't know who brought on what dates,
this is the thing.  And that's why the plaintiff allocation is
separate and apart from the settlement.  You know, there's a
separate order and it's independent, because we know that this
is kind of a --

THE COURT:  Well, without knowing exactly who bought
on what date, you did know when you brought that first motion
for attorneys' fees, for approval of the Class settlement, that
I had already dismissed the Exchange Act claims without
prejudice, with leave to amend, and you had not amended the
complaint, which you could have done.

MR. SADLER:  Sure.

THE COURT:  And so you knew that those -- would you
agree that those Exchange Act claimants in that posture, where I
dismissed it without prejudice, gave you leave to amend, you
didn't, you would have a very difficult time, would you not, on
appeal trying to generate a large amount of percentage

settlement for those claimants?

MR. SADLER:  I think we would disagree about our chances of success on appeal.  And I don't want to argue this.  Obviously, the Court has their opinion.

But, also, and to kind of get back to what I was saying before, is without our -- the subsequent rulings on tracing and standing, we were doing it in a way that under -- before, like how you did it with the timing, it didn't lead to such a result as it did now.  Like if you had taken the two Classes that exist now and put them in the plan of allocation then, the delta wouldn't have been as strong.

But, look, we -- respectfully, we agree.  We get it; you know, you made it clear.  We thought, and as we put it, you know, we had -- on a subsequent submission, we explained that we thought our appellate rights were better and that we had a very strong chance of bringing those claims back in.  And the Court very clearly said "No," we disagree with you, and we respect that.  But -- and we're happy with the way it ultimately was done.  You know, we stand by how we did it originally.  And obviously, the Court disagrees with us.  And, you know, that's obviously your decision.  And we then went forward and did it in the manner that we thought would satisfy the Court, and it did with where we added a plaintiff and we remediated this and got to where we are.

THE COURT:  All right.  Although I have some

difficulty with the total amount being claimed, I don't have any problem with your agreement as to how you're going to allocate what the award is.

MR. SADLER:  Sure.

THE COURT:  And I recognize two things:  One is it's been a very complicated case; and two, given what was left in the case after I entered my orders, you got a very favorable return.  And the Court recognizes that and will obviously take that into account, as well, in determining what amount of fees I'm going to award.

MR. SADLER:  And, Your Honor -- and, thank you, I appreciate that.

And to get back to you, that's kind of how we would like the Court to view this.  This is a results-oriented, you know, business, legal profession.  Here, we got a fantastic result, we did.  And, you know, we're asking for 25 percent, which is the standard, and our Lodestar is low.  But, you know, in the Ninth Circuit -- and the Ninth Circuit's approved lots of cases where the Lodestar amounts were literally up to 4, right?  And so we're not asking for some -- like even if you only considered certain hours, we would still be way under multipliers that we're doing.  So that's why we're saying, we got a fantastic result, we're asking for the standard.  You know, if you look at our Lodestar, it's supported.  But even if you deducted the Lodestar a bunch and you only considered half of it, you would

then have a multiplier of 2, which is way under the threshold for courts that are commonly approved where you had multipliers up to 3 and 4, which is not what we're asking for.  I'm just saying, it's kind of a thought exercise that however you look at it is very reasonable, right?

And that kind of gets me to -- and I don't know if the Court wants me to address -- the contributing-counsel motion, where they put in their own motion?  You know --

THE COURT:  Do you want to be heard now or do you want to wait and see if there's -- that seems separate and apart from --

MR. SADLER:  I agree with the total, obviously, I mean, in that --

THE COURT:  Well, give me your two cents now because that's really all I need from you on those issues.

MR. SADLER:  Okay.  My two cents is just this, the Ninth Circuit and even the cases they cite are very clear that in the Ninth Circuit, it's basically if you create, discover, increase, or preserve a fund, you're entitled to fees.

The fund here is $10 million.  That is what was created. Their motion doesn't even mention the 10 million, it's not about that.  They say they hypothetically preserved some judicial resources.  And while we appreciate that, that's not improving the amount of the fund.  They say that the allocation was -- and I -- to be honest with you, I don't quite understand how they're

saying that the two lead plaintiffs led to the subsequent mediation, but, whatever.  Even that is not the ultimate settlement fund.

The Ninth Circuit is clear, their own cases are clear, you need to have been counsel that was actively involved and impacted the settlement fund, which was $10 million.  And even by their own admission, they didn't do that.  So we would say, you know, that it should be denied.

And also, in these kind of PSLRA cases where you have a process in the beginning to have leadership structure, that that should be -- you know, we don't want just anyone who files a motion coming forward and making fees because they made some argument that might have been accepted, that's kind of not the universe we're in.  The PSLRA was specifically created to kind of limit that, right?  I mean, it was made to -- here -- here's an orderly process, we're appointing lead counsel, and they're going forward.

So that's all I have to say about that.

THE COURT:  All right.  Thank you.

MR. SADLER:  Thank you.

THE COURT:  Well, I think that gets us to the other motion, which results in the -- we've got two other requests for fees.

Let me hear from the Keller Rohrback, Longman firm, you wish to be heard on your motion?

MS. FARRIS:  Yes, Your Honor.

Thank you, Your Honor.

THE COURT:  So let me -- if I were to award you any fees, where would the fees come from?  I mean, are you taking it out of the 10 million?  Are you taking it out of their fees?  Where would you pose that we take that money from to give to your firm?  You didn't really address that in your motion.

MS. FARRIS:  Sure.  I can address that now.  And there are also a couple of points that were made by counsel that I want to address, but to answer your question directly, I think there are several solutions that you could use to award the additional fees that contributing counsel has requested.

And just to be clear, if you look at it as a percentage, our request of 62,000 in fees and costs would represent approximately .6 percent of the $10 million award.

THE COURT:  Well, it represents $62,000; where is it coming from?  Where is it coming from?

MS. FARRIS:  So the way that it -- the way that it could be awarded:  One, if the Court reduces the fee of Class counsel, then it could come out of the amount that they have requested.

I want to be clear on --

THE COURT:  But that's not acceptable.  I mean, to the extent I reduce their fee, it's got nothing to do with your activities.

MS. FARRIS:  You're right, it's not anything to do with my activities.  But if the Court's goal is to keep the fee under 25 percent and their -- that fee has already been reduced, then the total award to counsel would not exceed the 25 percent benchmark.

The other option is to increase from the 25 percent benchmark to what would amount to 25.06 or 25.6 percent.  And that would provide the award that contributing counsel has requested.

THE COURT:  Has there been any notice of your fee request to the Class?  I mean --

MS. FARRIS:  The --

THE COURT:  -- you've only come on the scene quite late in terms of making your motion.  It wasn't part of any notice that the Class got.  I certainly couldn't take it out of the fund that's going to be left for the Class; would you agree with that?

MS. FARRIS:  Your Honor, notice was given to the Class that there would be requests.  And our papers were filed at the first opportunity to file.  The total amount under either of the scenarios that I've suggested would not exceed what counsel has already acknowledged the Class was notified of, which was a request of up to 33 percent.  The papers were made available on the public docket.

THE COURT:  Help me understand your role that would

justify any award.

MS. FARRIS:  Sure.

Your Honor, I do disagree with a few of the legal points that were made.

Number one, we are not talking about work that was performed after leadership was appointed.  In those situations I think counsel is right, that lead counsel gets to decide who will do what work.

During the period before leadership is appointed, though, we are in a different situation under the case law.  And it is really up to the Court as the -- taking responsibility on behalf of the Class to decide whether counsel conferred a benefit.

If the Court believes --

THE COURT:  That's what I asked you, and I haven't heard it yet, what was the benefit?

MS. FARRIS:  The benefit, in our view, Your Honor, was to notify the Court at the earliest possible opportunity of the need for there to be separate representation for the Securities Act claims, as opposed to the exchange claims.

Counsel has said that this didn't confer a benefit to the Class because the benefit was the conservation of judicial resources and the -- that our argument that streamlining the experience and the timeline by having someone with standing available when the Exchange Act claims were dismissed only benefited the Court and counsel and somehow did not benefit the

Class; I disagree there.

THE COURT:  Your position originally was, I think, that you wanted me to appoint a separate lead plaintiff for the claims, is that right, under the Securities Act?

MS. FARRIS:  Your Honor, that was our point.  And what the Court did instead was to prevent -- was to appoint Plaintiff Rafi, who did have both Securities Act and Exchange Act claims. And your opinion said, I have decided to appoint counsel now, but because Plaintiff Rafi has a larger loss with the Securities Act, I'm going to appoint him over plaintiff -- the Slyne plaintiffs.

THE COURT:  There was no question that I had to do that under Ninth Circuit law.  He had, by far, the largest claim.

MS. FARRIS:  Well, I believe what contributing counsel -- the argument that we have made is that the concept of having two was not mandated, that is a suggestion that we made that -- and that aspect of our suggestion was taken up with the -- by the Court.  There was no other plaintiff at that time who sought to have a separate plaintiff representing the Securities Act.

And as the case unfolded, it became clear that that was a good decision on the part of the Court.

THE COURT:  Well --

MS. FARRIS:  The timeline for the case, had the Exchange Act claims been dismissed and there had been no one to

represent the Securities Act claims, would have been delayed. And in our view, that is a benefit for the Class.

I have not quantified it; I could. I could look at the time, interest, value of money. I could look at the way -- the extent to which individual plaintiffs in Classes with long delays are encouraged to sell their claims, which indicates that there's a value to the Class for expediency in the resolution of a case. And there is a value to the Class for conservation of judicial resources or key decisions that the Court makes that benefits the Class, even if it's not directly quantified. And the case law does allow for that.

If the Court had hired a special master to decide how to appoint lead plaintiffs and whether to have one or two, the Class would pay for that.

We have not asked for all of our time and expenses. Our request was limited only to the time and expenses that went to that specific issue and the time that we invested in raising that issue to the Court at the earliest possible date. And that's what we're asking for.

THE COURT: All right. Thank you. I understand your position.

All right. I think we've dealt with the attorneys' fees and costs to the extent that -- are there any other issues, anybody else need to be heard?

MR. SADLER: Your Honor, I would have responded --

THE COURT:  Oh, you don't need to respond.  You had your two minutes before, which you maybe used five or six minutes.

I heard what you had to say.

MR. SADLER:  Okay.

THE COURT:  I don't, frankly, believe that there was a reason.  Counsel seems to suggest that I made some ruling based on what they presented and that's not the case.  I essentially rejected that idea and appointed co-lead counsel, and that's I think where we are.

All right.  Anything further for the good of the order?

I'm going to enter an order, may not go out until the end of next week because there are, obviously, many details to provide.  If it can go out sooner, we'll attempt to put it in place quickly.

Anything further we need to consider today?

MR. HOFFMAN:  No, Your Honor.  Thank you.

THE COURT:  All right.  I, again, want to thank everyone for being here.  I know the lawyers had a great incentive to be here, the administrator maybe not so much.  I mean, he was here because these numbers were a little bit uncertain.  And I appreciate the last-minute effort to clarify where we were in terms of the questions that we asked and you responded to, and so I appreciate you being here.  I know you're from out of town.

In any event, the lawyers are here because they're looking for fees, and I understand that as well.

I would have to say, this has been a challenging case all around. It's been an interesting case. And I'm pleased to be able to say the settlement is very reasonable. And the lawyers are to be commended for proceeding with the ultimate mediation and settlement along terms that I think are fair, reasonable, and provide the claimants with a very good return on their claims.

So with that, again, have a pleasant day, and we'll be in recess.

THE CLERK:  All rise.

Court is in recess.

(Court recessed 11:24 a.m.)

C E R T I F I C A T E

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Marci E.C. Chatelain

Marci E.C. Chatelain, CCR, RPR, RMR, CRR
Federal Court Reporter